# UNITED STATES BANKRUPTCY COURT    EASTERN DISTRICT OF WISCONSIN

In the Matter of:

**MAYVILLE DIE & TOOL, INC.,**        Case No. _11- 33128_

        Debtor.

---

### MOTION FOR ORDERS: (1) AUTHORIZING DEBTOR TO SELL SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO THE APA; (2) APPROVING BIDDING PROCEDURES AND AUCTION; (3) APPROVING BREAK-UP FEE; (4) AUTHORIZING DEBTOR TO DISBURSE SALE PROCEEDS; (5) APPROVING NOTICE; AND (6) SCHEDULING FURTHER HEARING

---

Mayville Die & Tool, Inc., Debtor and Debtor-in-Possession ("Mayville" or "Debtor"), by its counsel, Jane F. (Ginger) Zimmerman and Rebecca R. DeMarb of Murphy Desmond S.C., hereby moves the Court for an order authorizing the Debtor to sell substantially all of its assets in the manner more fully set forth below (the "Sale Motion"). In support of its Motion, the Debtor states as follows:

    1.    On the date of this Sale Motion (the "Petition Date"), the Debtor filed its Petition for protection pursuant to Chapter 11 of Title 11 of the United States Code.

    2.    Mayville is continuing in possession of its property and is operating and managing its business pursuant to 11 U.S.C. §§ 1107 and 1108. To date, a creditors' committee has not been established and a trustee has not been appointed.

    3.    This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Fed. R. Bankr. R. 5005. This is a core proceeding.

Jane F. (Ginger) Zimmerman
State Bar No. 1012103
jzimmerman@murphydesmond.com
Rebecca R. DeMarb
State Bar No. 1026221
rdemarb@murphydesmond.com
Murphy Desmond S.C.
33 East Main Street, 5th Floor
P.O. Box 2038
Madison, WI 53701-2038
Phone: (608) 257-7181
Fax: (608) 257-4333

4. The relief sought in this Sale Motion is based upon 11 U.S.C. §§ 105(a), 363, 541, 328, 554(a) and Fed. R. Bankr. P. 2002(a)(2), 4001, 6004, 6004(h), 6006 and 6006(d).

5. Mayville proposes to sell substantially all of its assets, including its real estate and fixtures in Mayville, Wisconsin, its accounts receivable, and up to $40,000 in cash and accounts (the "Assets"), all pursuant to the Asset Purchase Agreement ("APA") with Mayville Asset Acquisition, LLC (the "Stalking Horse"), a true and correct copy of which is attached hereto as Exhibit A. Debtor seeks this Court's approval of the proposed sale transaction and related bidding procedures described herein to enable the Debtor to solicit competing offers for the Assets to ensure maximum recovery for the estate.

6. Mayville is a Wisconsin Corporation owned by an Employee Stock Ownership Plan ("ESOP"). In existence since 1935, Mayville is a machining company that specializes in large forging dies for use by customers in aerospace, windmills, railroad, airline, large yacht racing boats and large equipment manufacturers. Mayville employs 22 people full time at its location in Mayville, Wisconsin.

7. On the Petition Date, Mayville was indebted to Hometown Bank of Fond du Lac, Wisconsin (the "Bank") in the approximate amount of $2,576,859.01.

    a. The lending relationship between the Bank and Mayville dates back to 2002. In 2003, the Debtor and the Bank entered into a Term Loan in Part A and Part B in the original principal amount of $2 Million and $500,000, respectively, at the non-default interest rate of 7.25% per year and regular monthly payments of approximately $21,800 per month. On the Petition Date, Mayville was indebted to the Bank, on the Term Loan, in the amount of approximately $1,324,917.43.

    b. In addition to the Term Loan, Mayville is indebted to the Bank pursuant to a Note entered into in October of 2009, in the original amount of up to

$1,462,500.00, plus interest at the rate of prime plus 2.5% (currently 5.75%) per annum (the "2009 Note"). On the Petition Date, Mayville was indebted to the Bank, on the 2009 Note in the amount of approximately $1,251,941.58.

8. The Bank claims a security interest in substantially all of Mayville's assets.

    a. The Bank recorded the following mortgages against the real estate Mayville owns located at 700 Furnace Street, Mayville, Wisconsin (the "Real Estate") with the Dodge County Register of Deeds: July 5, 2002, as Document Number 960801; May 1, 2003, as Document Number 988263; and November 19, 2009 as Document Number 1137367.

    b. The Bank perfected its interest in personal property collateral, including cash collateral, granted pursuant to Security Agreements dated May 1, 2003 and November 12, 2009, and General Business Security Agreements dated June 28, 2002 and October 31, 2003, by filing UCC-1 Financing Statements with the Wisconsin Department of Financial Institutions on July 1, 2002, May 6, 2003, November 4, 2003, and January 16, 2009.

    c. In addition, the Bank's collateral includes purchase money security interests in various specific equipment by virtue of a Chattel Security Agreement dated May 1, 2003, and Financing Statement filed on May 20, 2003, and a Commercial Security Agreement dated November 12, 2009, and Financing Statement filed on November 17, 2009.

    d. Bank has further perfected its interest in fixtures by virtue of a Financing Statement filed with the Dodge County Register of Deeds on May 1, 2003 and continued on January 22, 2008.

9. In addition to Hometown Bank, Citibank, NA, claims a security interest in any accounts receivable from Alcoa Inc., pursuant to an agreement and a UCC-1 Financing Statement filed on January 3, 2005, continued September 22, 2009.

10. In 2007, the ESOP, which is and acts as the shareholders of the corporation, voted to remove the president and the board of directors of Mayville, and then hired a new board of directors and a new temporary CEO. Soon after, Mayville spent over $1.5 million

on equipment without setting up proper lines of credit, and paid down approximately $200,000 on its term debt, again without penning up any ability to borrow on a line of credit.

11.     Due to the decisions made in 2007, coupled with a downturn in business and the general economy, Mayville has experienced serious cash flow issues. The Bank has refused to advance any further funds. Although Mayville searched for a new lender, it was not able to find one willing to finance the operations of the business.

12.     Mayville began looking for a buyer of the business after it became clear that it would not be able to avoid default with the Bank or borrow additional operating capital. Since late 2010, Mayville has been in contact with seven companies to find a potential buyer. To date, the highest and best offer to purchase has been made by Mayville Asset Acquisition, LLC (the "Stalking Horse") in the Asset Purchase Agreement dated August 24, 2011 (the "APA").

13.     Mayville's ability to operate and pay its employees became contingent upon its entering into the APA. The base purchase price of the APA, subject to adjustments, is $2.3 million. The APA required Mayville's chapter 11 filing so that the Stalking Horse may receive the benefits of 11 U.S.C. § 363.

## THE ASSET PURCHASE AGREEMENT

14.     The Stalking Horse is unrelated to the Debtor, is not a shareholder or other insider. However, the Stalking Horse is related to A. Finkl & Sons, Co., a company that is a customer of and a supplier for Mayville.

15.     As defined in the APA, the Assets consist of assets owned by Mayville and used in the operation of its business, including its real estate and fixtures in Mayville, Wisconsin, all machinery and equipment, inventory, work in process, rights pursuant to assumed contracts, intangible assets, its accounts receivable, up to $40,000 in cash and accounts.

16.     The base purchase price set forth in the APA is $2.3 million.

17.     The APA provides for a Break-Up Fee of $100,000, payable to the Stalking Horse, as described in the APA. The Break-Up Fee is payable to the Stalking Horse in the event the Court determines that it is in the best interest of the Bankruptcy Estate to sell the Assets to a purchaser other than the Stalking Horse, and then only upon closing of such a sale. The Break-up Fee is stated in Section 7.5.2(c) of the APA.

18.     Debtor believes that the amount of the Break-Up Fee and the conditions under which it would be payable to the Stalking Horse are reasonable under the circumstances. The Break-Up Fee is 4% of the base purchase price and the Break-Up Fee is necessary to ensure that the Stalking Horse will continue to pursue its proposed acquisition of the Assets. Such fee also represents an approximation of the costs and expenses incurred and to be incurred by the Stalking Horse in conducting due diligence, preparing the APA and participating in an auction, and preparing information that will be made available to other potential bidders at no cost to them, that will form the basis for any other competing bids. Such continued participation by the Stalking Horse allows for the maximization of value of the Debtor's estate by, among other things, establishing a bid standard and minimum bid for other bids and to attract additional bidders. The amount of the Break-Up Fee is also commensurate with the substantial efforts that have been and will be expended by the Stalking Horse, to the benefit of the Debtor's estate. Finally, in this case, the Stalking Horse is risking even more than in a typical case because the APA acknowledges that the Stalking Horse will be making cash advances to Mayville to help fund Mayville during this Chapter 11 case.

19.     Debtor seeks authority to sell the Assets to the Stalking Horse pursuant to the APA and 11 U.S.C. § 363, subject to higher and better bids received through an auction ("Auction") and by the process described in the proposed Bidding Procedures.

20.     The Stalking Horse does not have an interest materially adverse to the Debtor or the estate. The Debtor submits that the Stalking Horse is entitled to the protections

afforded a good faith buyer pursuant to 11 U.S.C. § 363(m), as the APA is a product of good faith, arms-length negotiations.

21.     The Debtor has determined, in the exercise of its sound business judgment, that the sale of its Assets to the highest bid at the Auction, or if there is no Auction, to the Stalking Horse pursuant to the APA, is appropriate and in the best interests of the Debtor's estate and creditors.  The sale of the Assets pursuant to the APA at the Auction will allow the Debtor to continue operations, keep employees employed and capture its going concern value.

22.     The Debtor believes it is in its best interests and that of its estate to conduct the Auction in accordance with the procedures described in the Sale Motion and the Bidding Procedures, attached as Exhibit B, and on substantially the same terms and conditions described in the APA.

23.     The Debtor will also continue to afford all interested parties an opportunity to conduct due diligence with respect to the Assets.

24.     Upon the execution of the APA and filing of this Sale Motion, Debtor will solicit every party known by the Debtor to have indicated an interest in purchasing the Assets and it will facilitate all reasonable due diligence requirements of interested parties.   In addition, within the limits of the Debtor's cash constraints, the Debtor will seek every available medium of advertising, including online and print sources.

25.     The Debtor believes good cause exists to approve the APA, the Auction and the Bid Procedures.  The terms and conditions of the Auction are reasonable and will enable the Debtor and its creditors to realize the maximum value for the assets.  The Debtor further believes that the bidding process will yield the highest and best bids for the assets.

### **RELIEF REQUESTED**

26. In accordance with 11 U.S.C. § 363(f), a debtor-in-possession may sell property under Section 363, ". . . free and clear of any interest in such property of an entity other than the estate. . ." if one of the following conditions is satisfied:

    (1)    Applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    (2)    Such entity consents;

    (3)    Such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)    Such interest is in *bona fide* dispute; or

    (5)    Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

27. The Debtor will attempt to receive the consent of the Bank to the relief sought in this Sale Motion. If such consent is not obtained, however, the Debtor requests that the liens, claims and encumbrances asserted against the affected Assets by any creditor be transferred and attached to the net proceeds from any sale received by the Debtor, subject to the rights, claims, defenses and objections, if any, of any and all interested parties with respect thereto. Debtor requests authority to sell the Assets free and clear of liens, claims and encumbrances whether the Assets are sold to the Stalking Horse pursuant to the APA or to a Prevailing Bidder after Auction.

28. Pursuant to and subject to 11 U.S.C. § 363(k), the Bank is permitted to credit bid at the Auction. The Bank is deemed to be a Qualified Bidder for purposes of the Auction. However, the Bank must notify Debtor's counsel, in writing by the Bid Deadline, of its intent to credit bid and the amount of its initial credit bid, which shall be deemed a Qualified Bid for purposes of conducting the Auction.

29.     After payment of typical closing costs, including any outstanding real estate taxes, Mayville proposes to distribute the net proceeds to the Bank, less (i) $20,000.00 to be deposited into Murphy Desmond's trust account to be used for administrative expenses of the Case; and (ii) the Break-Up Fee, if applicable.  If the net proceeds, less the $20,000.00 and the Break-Up Fee, if applicable, are sufficient to pay the Bank in full, then Mayville is requesting the authority to pay the Bank in full and for the balance of the net proceeds to be deposited into Murphy Desmond's trust account to be distributed, pending further order of the Court.

30.     Debtor requests that an order approving the sale to the Stalking Horse APA or any other higher and better bidder include the protections as provided by 11 U.S.C. § 363(m).

31.     In the event that a party submits a Qualified Bid to the Debtor and the Debtor conducts an Auction, the Debtor requests that the Court hold a hearing to approve the sale of the Assets to the highest bidder or bidders pursuant to 11 U.S.C. §§ 363(b), (f) and (m) and 365 (the "Sale Approval Hearing").  If the Debtor does not conduct an Auction because there are no Qualified Bids submitted, then no further hearing will be necessary.  Debtor's counsel will notify the Court within 24 hours after the Bid Deadline if an Auction will be held and whether the second hearing will be necessary.

32.     Fed. R. Bankr. P. 6004(h) and 6006(d) provide, in substance, that an order authorizing the sale of a debtor's property is stayed for a period of 14 days after entry of the order by the court unless the court orders otherwise.  The Debtor requests that any order approving the relief requested herein become effective immediately, by providing that the 14-day stay is inapplicable to this proposed sale.  The Debtor needs to effectuate the asset disposition transaction(s) described herein without waiting the period provided for under Rules 6004(h) and 6006(d).  The financial realities of this case compel the Debtor to effectuate the transaction as expeditiously as possible so as to ensure that it will have

sufficient funds available to administer this case and continue operations without interruption. Further, the APA requires closing within ten (10) business days of a sale approval order.

33. The Debtor submits that the form of the Notice attached hereto as Exhibit C is sufficient to inform creditors and other parties in interest of the Bidding Procedures, terms of the APA and the Auction. Debtor requests approval of the form of the notice attached as Exhibit C.

34. The Declaration of Jane F. (Ginger) Zimmerman, filed pursuant to 6004(a) of the Local Rules of the United States Bankruptcy Court for the Eastern District of Wisconsin (the "Local Rules"), is attached hereto as Exhibit D.

35. The Declaration of Glen V. Helmbrecht, filed pursuant to Local Rule 6004(b), is attached hereto as Exhibit E.

36. The Declaration of Steven D. Denten in Support of Good Faith Finding Under 11 U.S.C. § 363(m) in Favor of Proposed Stalking Horse Purchaser, filed pursuant to Local Rule 6004(f), is attached hereto as Exhibit F.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an order, in the form of the order filed concurrently with this Sale Motion:

A. Authorizing the Debtor to sell to the Stalking Horse or a higher bidder at the Auction, if any, substantially all of its assets, including the Real Estate and all other assets specifically included in the APA, pursuant to the APA and the Bidding Procedures, free and clear of all liens, claims, interests and encumbrances including, without limitation, the liens of the Bank and any other secured creditor, which liens, claims, interests and encumbrances will attach to the proceeds of sale in the same order and priority that existed at the commencement of the case;

B. Approving the Bidding Procedures;

C.  Approving the Break-Up Fee;

D.  Scheduling a hearing to approve the Bidding Procedures in advance of the Sale Approval Hearing;

E.  Scheduling the Sale Approval Hearing for a date to be set by the Court as soon as possible following the Auction;

F.  Authorizing the Debtor to disburse the net proceeds of the Sale, after payment of usual closing costs including outstanding real estate taxes, and less $20,000.00, and up to an amount sufficient to pay the Bank, in full, and to deposit the balance of the net proceeds (including the $20,000.00 ) in the Murphy Desmond Trust Account; and

G.  Granting such other and further relief as the Court may deem just and equitable.

Dated this _____ day of August, 2011.

**MURPHY DESMOND S.C.**
Attorneys for Debtor-in-Possession

By:_____
    Jane F. (Ginger) Zimmerman
    State Bar No. 1012103
    Rebecca R. DeMarb
    State Bar No. 1026221
    33 East Main Street, Suite 500
    P.O. Box 2038
    Madison, WI  53701-2038
    (608) 257-7181

4811-9350-0170, v.  1

# ASSET PURCHASE AGREEMENT

## By and Among

## MAYVILLE ASSET ACQUISITION, LLC

### Buyer

### And

## MAYVILLE DIE & TOOL, INC.

### Seller

---

**As of August 24, 2011**

---

# TABLE OF CONTENTS

**Page**

I.      DEFINITIONS ..................................................................................................1

II.     THE TRANSACTION ......................................................................................7

    2.1     Purchase of Assets ...............................................................................7

    2.2     Liabilities .............................................................................................9

III.    PURCHASE PRICE ........................................................................................10

    3.1     Purchase Price ....................................................................................10

    3.2     Allocation ...........................................................................................11

    3.3     Payments ............................................................................................12

    3.4     Title to Buyer Blocks .........................................................................12

IV.     CLOSING .......................................................................................................12

    4.1     Closing ...............................................................................................12

    4.2     Closing Obligation .............................................................................12

    4.3     Conditions Precedent to Obligation of Buyer to Close .....................14

V.      REPRESENTATIONS AND WARRANTIES OF SELLER............................15

    5.1     Organization, Good Standing and Ownership ...................................15

    5.2     Authority; No Conflict .......................................................................15

    5.3     Ownership of Seller ...........................................................................16

    5.4     Financial Statements ..........................................................................16

    5.5     Records ...............................................................................................17

    5.6     Tangible Personal Property.................................................................17

    5.7     The Business; Accreditations; Authorizations....................................17

    5.8     Inventory; Accounts Receivable.........................................................17

    5.9     No Undisclosed Liabilities .................................................................17

    5.10    Taxes...................................................................................................17

    5.11    No Material Adverse Change ..............................................................18

    5.12    Employee Benefits..............................................................................18

    5.13    Compliance with Legal Requirements................................................18

    5.14    Legal Proceedings; Orders.................................................................18

    5.15    Contracts; No Defaults .......................................................................19

    5.16    Insurance.............................................................................................19

Case 11-33128-jes    Doc 7    Filed 08/25/11    Page 12 of 112

**TABLE OF CONTENTS**
(continued)

| | | | |
|---|---|---|---|
| | 5.17 | Personnel | 19 |
| | 5.18 | Intellectual Property Assets | 20 |
| | 5.19 | Illegal Payments | 20 |
| | 5.20 | Disclosure | 20 |
| | 5.21 | Brokers or Finders | 20 |
| | 5.22 | Environmental Matters | 20 |
| VI. | | REPRESENTATIONS AND WARRANTIES OF BUYER | 21 |
| | 6.1 | Organization and Good Standing | 22 |
| | 6.2 | Authority; No Conflict | 22 |
| VII. | | COVENANTS OF THE PARTIES | 22 |
| | 7.1 | Restrictive Covenants | 22 |
| | 7.2 | Employees | 23 |
| | 7.3 | Change of Name | 23 |
| | 7.4 | Cooperation | 23 |
| | 7.5 | Bankruptcy Auction and Sale Process | 24 |
| | 7.6 | Pre-Closing Covenants | 28 |
| VIII. | | SURVIVAL; REMEDIES | 29 |
| | 8.1 | Survival | 29 |
| | 8.2 | Remedies | 30 |
| IX. | | GENERAL PROVISIONS | 30 |
| | 9.1 | Expenses | 30 |
| | 9.2 | Public Announcements | 30 |
| | 9.3 | Notices | 30 |
| | 9.4 | Termination | 31 |
| | 9.5 | Further Assurances | 32 |
| | 9.6 | Waiver | 32 |
| | 9.7 | Entire Agreement and Modification | 35 |
| | 9.8 | Assignments; Successors; No Third-Party Rights | 33 |
| | 9.9 | Section Headings; Construction | 33 |
| | 9.10 | Governing Law | 33 |

Case 11-33128-jes    Doc 7    Filed 08/25/11    Page 13 of 112

# TABLE OF CONTENTS
(continued)

9.11    Jurisdiction...........................................................................................................33

9.12    Counterparts........................................................................................................34

-iii-

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of the 24th day of August 2011, by and among MAYVILLE ASSET ACQUISITION, LLC, a Delaware limited liability company ("Buyer"), and MAYVILLE DIE & TOOL, INC., a Wisconsin corporation ("Seller").

## RECITALS:

A.  Seller is in the business of providing services to the dropforge industry including the refurbishing and machining of forging dies (the "Business") and has full title to the Purchased Assets (as defined herein); and

B.  Seller desires to sell the Purchased Assets and Buyer desires to purchase the Purchased Assets; and

C.  Buyer and Seller wish to enter into this Agreement to consummate a sale by Seller and purchase by Buyer of the Purchased Assets free and clear of any and all Interests (as defined herein);

NOW, THEREFORE, the parties hereto, each in consideration of the payments and the representations, warranties, covenants and agreements of the other provided for or contained herein, do hereby agree as follows:

## I.  DEFINITIONS.

For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1:

*"Accounts Receivable"* – amounts due for goods furnished or services rendered.

*"Accreditations"* — approvals, certifications and authorizations from industry and non-governmental standards setting organizations.

*"Advances"* — as defined in Section 7.6.2.

*"Agreement"* – as defined in first paragraph of this Agreement.

*"Assignment of Intangible Assets"* – as defined in Section 4.2.1(c).

*"Assignment of Purchased Contracts"* – as defined in Section 4.2.1(b).

*"Assumed Liabilities"* — as defined in Section 2.2.1.

*"ASTM"* – as defined in Section 7.6.3.

*"Bank"* – Hometown Bank, St. Cloud, Wisconsin.

Case 11-33128-jes    Doc 7    Filed 08/25/11    Page 15 of 112

"*Bankruptcy Case*" — the voluntary chapter 11 case commenced by Seller in the Bankruptcy Court.

"*Bankruptcy Code*" – title 11 of the United States Code, as amended.

"*Bankruptcy Court*" – the United States Bankruptcy Court for the Eastern District of Wisconsin.

"*Base Purchase Price*" - as defined in Section 3.1.1.

"*Breach*" — any untruthfulness or inaccuracy in any representation or warranty in, or any failure to perform or comply with, any covenant, obligation or other provision of, this Agreement or any agreement or instrument delivered hereunder.

"*Break Up Fee*" – as defined Section 7.5.2(c).

"*Business*" — as defined in the Recitals of this Agreement.

"*Buyer*" — as defined in the first paragraph of this Agreement.

"*Buyer Blocks*" — the blocks provided by, or for the benefit of, Buyer (or any affiliate of Buyer, including A. Finkl & Sons Co.) to Seller in connection with certain purchase orders contemplated by this Agreement or otherwise, including any improvements made to such blocks by Seller.

"*Buyer's Closing Documents*" – as defined in Section 6.2.1.

"*Closing*" — as defined in Section 4.1.

"*Closing Date*" — as defined in Section 4.1.

"*Consent*" — any approval, consent, ratification, waiver, or other authorization (including any Governmental Authorization).

"*Contemplated Transactions*" — all of the transactions provided for in this Agreement, including but not limited to the purchase and sale of the Purchased Assets and the filing of the Bankruptcy Case.

"*Contract*" — any agreement, contract, purchase order, sales order, obligation, promise or undertaking legally binding on Seller as of the Closing Date.

"*Customer*" – or "*Customers*" – as defined in Section 7.1.3.

"*DIP Financing Motion*" — an expedited motion filed by Seller in the Bankruptcy Case seeking the authority of the Bankruptcy Court to obtain Advances as set forth in Section 7.6.2.

"*Effective Time*" – as defined in Section 4.1.

"*Employees*" – as defined in Section 5.17.1.

"*Environmental, Health and Safety Liabilities*" — any cost (including for remediation), damages, expense, liability, obligation, or other responsibility arising from, under or in connection with any Environmental Law.

"*Environmental Law*" - any Law which relates to or otherwise imposes liability or standards of conduct concerning discharges, emissions, releases or threatened releases of any waste or Hazardous Material, whether as matter or energy, into ambient air, water, or land, or otherwise relating to the manufacture, processing, generation, distribution, use, treatment, storage, disposal, cleanup, transport or handling of waste or Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. 9601 et seq. "CERCLA"), the Resource Conservation and Recovery Act (42 U.S.C. 6901 et seq. "*RCRA*"), the Clean Water Act (33 U.S.C. 1251 et seq. "CWA"), the Clean Air Act (42 U.S.C. 7401 et seq. "CAA"), as in effect as of the Closing Date.

"*Environmental Permit*" - any Permit or other authorization required by or pursuant to any applicable Environmental Law.

"*ESOP*" – the Mayville Die and Tool, Inc. Employee Stock Ownership Plan, as set forth in an agreement between Seller and certain named trustees and dated June 23, 2009, as amended on June 24, 2009.

"*ESOP Trustee*" – collectively, the trustee or trustees of the trust governing the ESOP.

"*Excluded Assets*" — as defined in Section 2.1.2.

"*Financial Statements*" — as defined in Section 5.4.

"*Finished Products*" – the final end product produced by Seller for sale and delivery to its Customers;

"*Force Majeure*" – causes beyond a party's reasonable control, including, without limitation, fire, flood, earthquake, storm, hurricane or other natural disaster, war, invasion, act of foreign enemies, hostilities (regardless of whether war is declared), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation, terrorist activities, nationalization, government sanction, blockage, embargo, labor dispute, strike, lockout or interruption or failure of electricity or telephone service.

"*GAAP*" — generally accepted accounting principles in the United States.

"*Governmental Authorization*" — any approval, consent, license, permit, accreditation, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"*Governmental Body*" — any federal, state, local, county, municipal, foreign, or other governmental unit or body.

"*Hazardous Material*" - (a) any "hazardous substance," as defined by CERCLA; (b) any "hazardous waste," as defined by RCRA; (c) any petroleum product or fractions thereof; or (d)

hazardous, dangerous or toxic chemical, material or substance defined or identified as such pursuant to any Environmental Law.

"*IAM Pension Fund*" – the IAM National Pension Fund.

"*Indebtedness*" as defined in Section 2.2.1(b).

"*Intangible Assets*" — intangible assets and related rights including all Intellectual Property Assets, going concern value, goodwill, telephone and telecopy listings, email addresses, domain names, websites, software, licenses and related items.

"*Intellectual Property Assets*" — as defined in Section 5.18.1.

"*Interests*" — any claim, judgment, license, lease, sublease, lien, security interest, encumbrance, or any other interest of any kind or nature whatsoever, including, but not limited to, any charge, hypothecation, community property interest, condition, option, pledge, easement, right of first refusal, or restriction of any kind, including, without limitation, any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership or possession.

"*Inventory*" or "*Inventories*" — all finished goods, work in progress for the production of finished goods, raw materials, spare parts, and other materials and supplies to be used or consumed by Seller in the production of finished goods or the provision of its or their services.

"*Knowledge*" in the case of an individual means the knowledge of such individual after due inquiry of other Persons who might reasonably be expected to have knowledge of a relevant matter, and in the case of a corporation, means the knowledge of its officers, directors and shareholders after due inquiry of other Persons who might reasonably be expected to have knowledge of a relevant matter.

"*Law*" or "*Laws*" — any federal, state, local, county, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"*Liability*" — any liability or obligation of a Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and regardless of whether required to be accrued on the books or financial statements of such Person.

"*Material Adverse Change*" — any fact, circumstance, event, condition, occurrence or change during the Pre-Closing Period that has, has had, or would reasonably be expected to have, individually or in the aggregate, an effect that (i) is materially adverse to the assets, including the Purchased Assets, financial condition, results of operations, properties, prospects, liabilities or Business, taken as a whole, or (ii) would materially impair the ability of Seller to perform its obligations under this Agreement or otherwise materially impede consummation of the transactions contemplated hereunder, other than any fact, circumstance, event, condition, occurrence or change relating to (a) the general business, economic, political, social or regulatory

conditions, or the financial, banking or securities markets, in the localities, regions or countries in which the Business operates, *provided, however*, the impact of any such adverse change or effect does not disproportionately impact the Seller or the Business, (b) the industry in which the Seller operates in general, *provided, however*, the impact of any such adverse change or effect does not disproportionately impact the Seller or the Business, or (c) the announcement of the execution and delivery of this Agreement, (d) the filing of the Bankruptcy Case, or (e) the performance of any act or consummation of the Contemplated Transactions.

"*Order*" — any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

"*Ordinary Course of Business*" — an action taken by a Person which is:  (a) consistent with the past practices of such Person and taken in the ordinary course of the normal day-to-day operations of such Person; (b) is not required to be authorized by the board of directors of such Person (or by any Person or group of Persons exercising similar authority); and (c) is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business.

"*Organizational Documents*" — (a) the articles or certificate of incorporation and the by-laws of a corporation; (b) the articles of formation and operating agreement, or equivalent documents, of a limited liability company; (c) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (d) any amendment to any of the foregoing.

"*Person*" — any individual, corporation, general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

"*Phase II ESA*" – as defined in Section 7.6.3.

"*Pre-Closing Period*" — as defined in Section 7.6.1.

"*Proceeding*" — any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"*Purchase Price*" – as defined in Section 3.1.1.

"*Purchased Assets*" — as defined in Section 2.1.1.

"*Purchased Contract*" or "*Purchased Contracts*" —any Contract which is listed on Schedule 2.1.1(e), as may be amended, modified or supplemented from time to time before Closing.

"*Real Estate Documents*" – a real estate purchase agreement (or other similar agreement or closing memorandum as agreed by the parties) and the Transfer Deed(s) and all related

transfer tax declarations, surveys, title policies, and ALTA statements, as applicable, all in form and substance satisfactory to Buyer.

*"Records"* — as defined in Section 5.5.

*"Remediation Amount"* – as defined in Section 3.1.2(d).

*"Representative"* or *"Representatives"* with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

*"Retained Liabilities"* — as defined in Section 2.2.2.

*"Sale Motion"* — an expedited motion filed by Seller in the Bankruptcy Case seeking the authority of the Bankruptcy Court to authorize and direct Seller to consummate a sale of the Purchased Assets to Buyer pursuant to the terms of this Agreement.

*"Sale Order"* — an order entered in the Bankruptcy Case, in form and substance acceptable to Buyer, approving Seller's sale of the Purchased Assets to Buyer, which order shall have authorized Seller to convey to Buyer all of its right, title and interest in and to the Purchased Assets free and clear of any and all Interests.

*"Sales Procedures Order"* – an order entered by the Bankruptcy Court in the Bankruptcy Case, in form and substance acceptable to Buyer, expressly approving, among other things, the form and substance of this Agreement and certain sale and auction procedures to apply to Seller's sale of the Purchased Assets.

*"Schedule"* or *"Schedules"* — a schedule or the schedules delivered by one party to the other concurrently with the execution and delivery of this Agreement, which shall become a part hereof and incorporated herein by reference.

*"Seller"* — as defined in the first paragraph of this Agreement.

*"Seller's Closing Documents"* – as defined in Section 5.2.1.

*"Tangible Personal Property"* — as defined in Section 5.6.

*"Tax"* or *"Taxes"* — any federal, state, local or other tax or taxes to which a Person is subject, whether levied on or measured by income, assets or otherwise.

*"Tax Laws"* — any Law relating to the authorization, determination, levying or collection of any Tax and the administration and enforcement of Laws relating thereto.

*"Tax Return"* — any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax.

*"Term"* – as defined in Section 7.1.1.

*"Termination Event"* – as defined in Section 9.4.

*"Territory"* – as defined in Section 7.1.2.

*"Transfer Deed"* – the deed sufficient to transfer title of the real property described in Schedule 2.1.1(k) from Seller to Buyer free and clear of Interests pursuant to and in accordance with the Sale Order.

*"Work in Progress"* — work in progress (other than as included within the definition of Inventories) for the provision of services or goods to customers.

## II.     THE TRANSACTION

### 2.1     Purchase of Assets.

**2.1.1     Purchased Assets.**  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase and acquire from Seller, free and clear of any and all Interests, all right, title and interest in and to the following property and assets of Seller, wherever located:

(a)     all cash, cash equivalents and short term investments up to an aggregate value of $40,000;

(b)     all Tangible Personal Property, including but not limited to the items described in Schedule 2.1.1(b);

(c)     all Inventories, including but not limited to the items described in Schedule 2.1.1(c);

(d)     all Work in Process;

(e)     all rights under the Purchased Contracts identified in Schedule 2.1.1(e);

(f)     all Accreditations and Governmental Authorizations and all pending applications therefore or renewals thereof, including but not limited to those listed in Schedule 2.1.1(f), to the extent assignable;

(g)     all Intangible Assets including but not limited to the items described in Schedule 2.1.1(g);

(h)     all Accounts Receivable and all notes receivable, deposits and prepaid expenses;

(i)     All data, materials, information and records related to the Business, including all client and customer relationships, lists and records;

sales leads and referral sources; production reports and records; service and warranty records; equipment logs; operating guides and manuals; creative, advertising, promotional and sales materials; studies and reports; and correspondence and other documents and Records;

 (j) all claims against third parties relating to the Purchased Assets, whether choate or inchoate, known or unknown, contingent or noncontingent; and

 (k) all real property listed on <u>Schedule 2.1.1(k)</u>;

 (l) all other assets used in the Business, excepting only the Excluded Assets.

At any time prior to the Closing Date, Buyer shall have the right, but not the obligation, from time to time, by written notice to Seller, to update, supplement or amend any Schedule(s) hereto or add or exclude any assets as Purchased Assets or any Liabilities as Assumed Liabilities.

All of the property and assets to be transferred to Buyer hereunder are herein referred to collectively as the "Purchased Assets."

 **2.1.2** **Excluded Assets**. Notwithstanding anything to the contrary contained in Section 2.1.1 or elsewhere in this Agreement, the following assets of Seller (collectively, the "Excluded Assets") are not part of the sale and purchase contemplated hereunder, are excluded from the term "Purchased Assets" and shall remain the property of Seller after the Closing:

 (a) all cash, cash equivalents and short-term investments in excess of an aggregate value of $40,000;

 (b) all minute books, stock transfer records and company seals;

 (c) all personnel Records and other Records that Seller is required by law to retain in its possession, subject to Buyer's right to make copies thereof to the extent permitted by applicable Law; and

 (d) all of Seller's bankruptcy estate causes of action arising in or under the Bankruptcy Code.

**2.2** **Liabilities**.

 **2.2.1** **Assumed Liabilities**. As part of the consideration for the Purchased Assets, Buyer agrees to assume the following (but only the following) Liabilities (collectively, the "Assumed Liabilities"), and neither the purchase of the Purchased Assets nor anything else in this Agreement shall infer or be deemed to constitute the assumption of any other Liabilities with respect to the Seller, the Business or the Purchased Assets:

(a)     Liabilities under Purchased Contracts to the extent involving performance required thereunder to be performed after the Effective Time (but excluding any such Liabilities or performance required after the Effective Time on account of or due to Seller's Breach or other non-performance thereof on or before the Effective Time);

(b)     Liabilities arising solely from Buyer's actions after the Effective Time in the conduct of the Business and ownership of the Purchased Assets.

At any time prior to the Closing Date, Buyer shall have the right, but not the obligation, from time to time, by written notice to Seller, to update, supplement or amend any Schedule(s) hereto or add or exclude any assets as Purchased Assets or any Liabilities as Assumed Liabilities.

**2.2.2     Retained Liabilities.**  Seller shall retain and be solely responsible for performing, discharging and satisfying all Liabilities of the Business which are not expressly assumed by Buyer pursuant to Section 2.2.1 (collectively, the "Retained Liabilities"), including but not limited to all Liabilities:

(a)     for any debt or other obligations for borrowed funds, financial accommodations, obligations in respect of loans, letters of credit, advances, notes, bonds, debentures or similar instruments, capital lease obligations and trade payables;

(b)     arising out of or relating to goods produced, repaired, machined or sold, services performed, other conduct of the Business, or ownership of the Purchased Assets prior to the Effective Time;

(c)     under (i) all Contracts not expressly assumed in writing by Seller and assigned to Buyer pursuant to order(s) of the Bankruptcy Court, or (ii) under any Purchased Contract to the extent the Liabilities arise out of or relate to any Liability or Breach that arose or occurred prior to the Effective Time or any Liabilities or performance required after the Effective Time as are excluded in Section 2.2.1(a);

(d)     for Taxes, including (i) any Taxes arising as a result of Seller's conduct of the Business or ownership of the Purchased Assets, or other properties or assets, prior to the Effective Time or (ii) any Taxes arising as a result of the sale of the Purchased Assets;

(e)     involving or relating to employees of Seller including payroll, vacation or sick leave, workers' compensation and other obligations; unemployment benefits; union obligations; obligations under retirement, health care and other benefit plans and programs; employment discrimination, severance, grievance and similar claims; and all other obligations involving or relating to any current or former employees;

(f)    for obligations under any Law, including Environmental, Health and Safety Liabilities, arising out of or relating to the operations of Seller, conduct of the Business or the leasing, ownership or operation of any real property on or before the Effective Time;

(g)    arising from pending or threatened claims by or litigation involving any Person; and

(h)    arising from or relating to any claim or matter based on any act or omission of Seller in connection with the Business or Purchased Assets occurring on or before the Effective Time.

Upon Closing, Seller is hereby and shall be permanently enjoined from commencing, continuing or enforcing the Retained Liabilities against the Purchased Assets or Buyer.

## III.    PURCHASE PRICE

### 3.1    Purchase Price.

**3.1.1    Base Purchase Price.**  The purchase price (the "Purchase Price") for the Purchased Assets shall consist of a base amount of TWO MILLION, THREE HUNDRED THOUSAND U.S. Dollars (USD $2,300,000), (the "Base Purchase Price") subject to adjustment on the Closing Date as set forth in Section 3.1.2.  At Closing, Buyer shall pay the Base Purchase Price less any adjustment set forth in Section 3.1.2 below.

**3.1.2    Purchase Price Adjustment.**

(a)    The Purchase Price shall be decreased in a dollar-for-dollar amount equal to the aggregate of (i) the amount of accrued liability on Seller's balance sheet as of the Closing Date for Finished Products related to any pre-paid work purchase orders of the Buyer or any of its affiliates (including A. Finkl & Sons Co.) placed with Seller prior to the Closing Date, (ii) the aggregate balance, at Closing, of any discretionary loans made by Buyer or any of its affiliates (including A. Finkl & Sons Co.) pursuant to specific requests by Seller (in accordance with Section 7.6.2), and (iii) the Remediation Amount (as defined below). The Base Purchase Price less the adjustments set forth in this paragraph shall be the "Adjusted Purchase Price."

(b)    Seller shall at all times (i) maintain in accordance with GAAP a separate line item on its balance sheet related to accrued liabilities and short term loans for the items described in subsection (a) of this Section 3.1.2 and (ii) maintain an inventory of Buyer Blocks and Finished Products that are related to purchase orders placed by Buyer (or any of its affiliates) or are intended to be the property of Buyer (or any of its affiliates).

(c)     Until entry of a Sales Procedures Order, the Adjusted Purchase Price must be calculated every Friday afternoon. After entry of the Sale Procedures Order, the Adjusted Purchase Price must be calculated every weekday afternoon as prescribed in the Sales Procedures Order. The Adjusted Purchase Price will not be confidential and will be used to determine the amount of the initial overbid, as set forth in Section 7.5.2(a). The Sales Procedures Order shall expressly set forth the process for calculating the Adjusted Purchase Price in accordance with this Section 3.1.2.

(d)     Pursuant to Section 3.1.2(a)(iii), the Adjusted Purchase Price shall be further decreased in a dollar-for-dollar amount equal to the projected cost of remediating the real property included in the Purchased Assets (the "Remediation Amount") as reasonably determined by Buyer's environmental consultant. Subject to prior execution of strict confidentiality agreements acceptable to Buyer, in its sole and absolute discretion, Buyer agrees to grant Seller and its environmental consultant reasonable access to the salient information and reports, including any Phase II ESA, prepared or used by Buyer's environmental consultant, to confirm or contest the Remediation Amount. The process for any contest of the Remediation Amount shall be on terms to be reasonably agreed upon between Buyer and Seller, and the parties agree to an in camera review by the Bankruptcy Court of the subject matter of the dispute, including all information within the scope of the aforementioned confidentiality agreements.

(e)     For the avoidance of doubt, the Buyer's decision to consummate the transactions contemplated hereby, including the purchase of the real property included in the Purchased Assets, will in no way be deemed to constitute a waiver of any of Buyer's rights under the purchase price adjustments contained in this Section 3.1.2.

**3.2     Allocation.** The Purchase Price shall be allocated among the Purchased Assets in the manner set forth in Schedule 3.2, and Buyer and Seller agree to report the transactions provided for herein for all Tax and financial accounting purposes in a manner that is consistent with such allocation.

**3.3     Payments.** All payments required to be made from one party to another under this Article III shall be made by wire transfer of immediately available funds to an account specified by the party entitled to receive the payment.

**3.4     Title to Buyer Blocks.** Seller acknowledges, stipulates and agrees that (a) Buyer (or its affiliate as the case may be) retains, at all relevant times, sole and exclusive right, title and interest in and to the Buyer Blocks and (b), upon the occurrence or the existence of any Termination Event, (i) Seller shall have no right, title or interest whatsoever (whether pursuant to this Agreement or otherwise) in or to any of the Buyer Blocks and (ii) Buyer (or its affiliate as the case may be) shall be entitled to immediate possession and exclusive control of the Buyer

Blocks and shall be afforded immediate access during normal business hours to enter Seller's premises and take possession, custody and control of its Buyer Blocks. Seller agrees that any Sales Procedures Order (as defined herein) entered in the Bankruptcy Case shall include the foregoing Seller acknowledgments and stipulations and shall further provide that the automatic stay provisions of section 362 of the Bankruptcy Code shall be modified to permit Buyer or its affiliates to recover its Buyer Blocks and that Seller shall be enjoined from interfering with Buyer's, or its affiliate's, recovery of its Buyer Blocks.

## IV.   CLOSING

**4.1    Closing.**  The Closing of the Contemplated Transactions provided for in this Agreement (the "Closing") shall take place in Chicago, Illinois (or through another mutually agreed exchange of documents) within ten (10) business days of the Bankruptcy Court entering the Sale Order but not later than December 1, 2011 (the "Closing Date"), at a time to be agreed, and shall become effective at 11:59 p.m., at the prevailing Central Time, on the Closing Date (the "Effective Time").

**4.2    Closing Obligation.**  At the Closing:

**4.2.1        Seller's Closing Deliveries.**  Seller will deliver or cause to be delivered to Buyer, in form and substance acceptable to Buyer and its legal counsel:

(a)      bills of sale for all of the Purchased Assets that are Tangible Personal Property duly executed by Seller (the "Bills of Sale");

(b)      assignments, with any required Consents, of the Purchased Contracts, duly executed by Seller (the "Assignment of Purchased Contracts");

(c)      assignments of all of the Purchased Assets that are Intangible Assets duly executed by Seller (the "Assignment of Intangible Assets");

(d)      [intentionally omitted];

(e)      the Real Estate Documents duly executed by Seller;

(f)      all third party consents necessary to assign and transfer the Purchased Assets, as reasonably determined by Buyer;

(g)      a certificate of an officer of Seller (i) certifying and attaching copies of all required resolutions or actions of Seller's directors and the consent of the ESOP Trustee (A) approving the execution and delivery of this Agreement and the consummation of the Contemplated Transactions and (B) authorizing and approving the change of name contemplated by Section 7.3 accompanied by the requisite documents for amending the relevant Organizational Documents of Seller to effect such name change, (ii) certifying as to the incumbency and signatures of the

Person(s) executing this Agreement and any other document related to the Contemplated Transactions, and (iii) certifying that, as of the Closing, the Representations and Warranties of Seller are true and correct in all material respects, except where already qualified by materiality, in which case they are true and correct in all respects;

(h)     written confirmation from the IAM Pension Fund as to Seller's irrevocable withdrawal therefrom;

(i)     the Sales Procedures Order entered by the Bankruptcy Court in the Bankruptcy Case;

(j)     the Sale Order entered by the Bankruptcy Court in the Bankruptcy Case;

(k)     one or more orders entered by the Bankruptcy Court in the Bankruptcy Case authorizing Seller's assumption and assignment of the Purchased Contracts to Buyer as contemplated by this Agreement; and

(l)     any other assignments or documents of transfer as are reasonably required to effect the transfer to Buyer of all rights, title and interests in or to any of the Purchased Assets, free and clear of any Interests, including, without limitation, the transfer of Seller's right, title and interest in any deposit account up to $40,000;

For purposes of Section 4.2.1(g), the "consent of the ESOP Trustee" shall include a representation and warranty to Buyer that in accordance with the voting procedures in Section 7.7 of the ESOP, a majority of the shares of common stock of Seller held by the ESOP have been voted in favor of the matters described in Section 4.2.1(g)(i)(A).

4.2.2     **Buyer's Closing Deliveries.** Buyer will deliver and cause to be delivered to Seller, or such other party as identified below, in form and substance reasonably acceptable to Seller and its legal counsel:

(a)     the portion of the Purchase Price to be paid to Seller at Closing as described in Section 3.1;

(b)     the Assignment of Purchased Contracts duly executed by Buyer;

(c)     the Assignment of Intangible Assets duly executed by Buyer; and

(d)     a certificate of an official of Buyer (i) certifying and attaching copies of all required resolutions or actions of Buyer's board of directors approving the execution and delivery of this Agreement and the consummation of the Contemplated Transactions, and (ii) certifying as to

the incumbency and signature of the Persons executing this Agreement and any other document relating to the Contemplated Transactions.

**4.3    Conditions Precedent to Obligation of Buyer to Close.** The obligations of Buyer under this Agreement to consummate the transactions contemplated hereby will be subject to the satisfaction, at or prior to the Closing, of all of the following conditions, any one or more of which may be waived in writing at the sole option of Buyer:

(a)    no Breach by Seller has occurred or exists prior to or at the Closing and the Representations and Warranties of Seller set forth in Article V of this Agreement must have been true and correct in all respects when made and, as of the Closing, must be true and correct in all material respects, except where already qualified by materiality, in which case they must be true and correct in all respects.

(b)    Buyer shall have received all documents and other items to be delivered by Seller under Section 4.2.1;

(c)    no Material Adverse Change has occurred since June 30, 2011;

(d)    the termination of Seller's existing union contracts;

(e)    Buyer shall have received a fully executed union contract between the Buyer and the union Employees in form and substance satisfactory to Buyer in its sole and absolute discretion;

(f)    no strikes by the Employees or any applicable union representing any of the Employees have occurred or been threatened;

(g)    no event has occurred that would give rise to Buyer's right to terminate its obligations under this Agreement pursuant to Section 9.4;

(h)    no *Force Majeure* event has occurred which (i) resulted in any physical damage to any of the Purchased Assets; (ii) resulted in a material interruption of the business or operations of the Seller or the use of its assets; (iii) has caused or may reasonably be expected to cause any interruption in the business or operations of the Seller's business as of immediately prior to the Closing or in the use and enjoyment of the Purchased Assets by Buyer in any material respect.

(i)    the receipt of a completed and final environmental report (including, without limitation, with respect to the Phase II ESA as contemplated in Section 7.6.3) that is satisfactory to Buyer in its sole and absolute discretion; and

(j)     Buyer shall have received, prior to the commencement of the Bankruptcy Case, a signed letter from the IAM Pension Fund confirming Seller's irrevocable withdrawal therefrom.

## V.     REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to Bankruptcy Court approval, Seller represents and warrants to Buyer as follows, acknowledging that Buyer is relying on such representations and warranties for purposes of this Agreement and the Contemplated Transactions:

**5.1     Organization, Good Standing and Ownership.**  Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Wisconsin, with full legal power and authority to conduct its business as it is now being conducted, to own or use all properties and assets that it purports to own or use, and to perform all its obligations, including under all Contracts. Seller is duly qualified to do business as a foreign entity and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties and assets owned or used by it, or the nature of the activities conducted by it, requires such qualification.

**5.2     Authority; No Conflict.**

**5.2.1     Binding Obligation, Etc.** This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against it in accordance with the terms hereof except as such enforceability may be limited by bankruptcy, insolvency or similar laws or by general principles of equity.  Upon the execution and delivery by Seller of the documents and instruments required of it pursuant to Section 4.2.1 (collectively, "Seller's Closing Documents"), Seller's Closing Documents will constitute the legal, valid, and binding obligations of Seller, to the extent it is a party thereto, enforceable against it in accordance with their respective terms except as such enforceability may be limited by bankruptcy, insolvency or similar laws or by general principles of equity.  Seller has the absolute and unrestricted legal right, power, authority, and capacity to execute and deliver this Agreement and Seller's Closing Documents as required of it hereunder and thereunder and to perform its obligations under this Agreement and Seller's Closing Documents.

**5.2.2     No Contravention, Etc.** Neither the execution and delivery of this Agreement and/or Seller's Closing Documents by Seller, nor the consummation or performance by them of any of their respective obligations hereunder or thereunder, will directly or indirectly (with or without notice or lapse of time):

(a)     Contravene, conflict with, or result in a violation of any provision of the Organizational Documents of Seller or any resolution adopted by the directors or the shareholders of Seller;

(b)     Contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief

under, any Law or Order to which Seller, or any of the Purchased Assets, is subject;

(c) Contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body or Person the right to revoke, withdraw, suspend, cancel, terminate or modify, any Governmental Authorization or Accreditation that is held by Seller;

(d) Contravene, conflict with, or result in a material violation or breach by Seller of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Contract to which Seller is a party, except for Seller's agreements with Hometown Bank; or

(e) Result in the imposition or creation of any Interests upon or with respect to any of the Purchased Assets.

Except as set forth in Schedule 5.2.2, Seller is not, and will not be, required to give any notice to or obtain any Consent from any Governmental Body or Person in connection with the execution and delivery of this Agreement or Seller's Closing Documents or the consummation or performance of the Contemplated Transactions.

**5.3 Ownership of Seller**. The ESOP owns all of the capital stock and any other share interests or other ownership interests of any kind in and to Seller. No other Person has any ownership interest of any kind in or to Seller, and no other Person holds any option or has any other legally enforceable right to obtain any ownership right in or to Seller. Subject to Section 7.7 of the ESOP, the ESOP Trustee has full power and authority to act for and on behalf of the ESOP and to authorize the Contemplated Transactions, and to do such other actions as are reasonably necessary to carry out and consummate the transactions contemplated hereby.

**5.4 Financial Statements**. Seller has delivered to Buyer the financial statements of Seller for the years 2008, 2009 and 2010 and the interim financial statements for the 6-month period ended June 30, 2011 (collectively, the "Financial Statements"). The Financial Statements have been prepared in accordance with GAAP and fairly present the financial condition, results of operations, changes in shareholders' equity, and cash flows of Seller as at the respective dates of, and for the periods referred to in, such Financial Statements.

**5.5 Records**. All records with respect to the Business (including all books of account and financial records (collectively, "Records")), are true, complete and correct in all material respects and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls. Seller's minute books contain accurate and materially complete records of all meetings of, and corporate actions taken by, the shareholders and directors of Seller.

**5.6 Tangible Personal Property**. Except as set forth in Schedule 5.6, Seller has good and marketable title, free and clear of all Interests, to all items of tangible personal property used in connection with or otherwise useful to Seller and/or the Business (collectively,

"Tangible Personal Property"), including but not limited to all items listed in Schedule 2.1.1(b). All of the Tangible Personal Property is in good operating condition and repair consistent with the ages and uses of particular items, are adequate for the uses to which such items are being put, and none of such items is in need of maintenance or repairs except for ordinary and routine maintenance and repairs that are not material in nature or cost.

**5.7    The Business; Accreditations; Authorizations.**    Seller is exclusively engaged in the Business.  Seller holds the Accreditations and Governmental Authorizations listed in Schedule 2.1.1(f) in connection with the conduct of the Business, all of which are valid and in full force and effect.  To the best Knowledge of Seller, such Accreditations and Governmental Authorizations are all of the accreditations and authorizations required or necessary to conduct the Business as now conducted, and such Accreditations and Governmental Authorizations are freely assignable or transferable to Buyer.  Seller properly maintains (including the calibration of) all equipment used by it in connection with the Business as required by its Accreditations and Governmental Authorizations and sound business and technical practices, and keeps all required records of such maintenance and of the services performed using such equipment.

**5.8    Inventory; Accounts Receivable**. All Inventory of Seller consists of a quality and quantity usable and salable in the Ordinary Course of Business, except for obsolete items and items of below-standard quality, all of which have either been written off or written down to net realizable value in the Financial Statements.  All Accounts Receivable of Seller that are reflected on the accounting records of Seller as of the Closing Date represent or will represent valid obligations arising from sales of products or services performed in the Ordinary Course of Business.   Unless paid prior to the Closing Date, the sum of all such Accounts Receivable is or will be as of the Closing Date collectible in full, net of allowances for doubtful accounts and without any set-off.  To the Knowledge of Seller, there is no contest, claim, or right of set-off or recoupment on the part of any obligor regarding any such Account Receivable.

**5.9    No Undisclosed Liabilities**. Except as set forth in Schedule 5.9, Seller has no liabilities or obligations of any kind or nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise) except for liabilities or obligations reflected or reserved against in the Financial Statements or current liabilities incurred in the Ordinary Course of Business since the date of the interim Financial Statements.

**5.10    Taxes**.  Seller has filed or caused to be filed all Tax Returns that are or were required to be filed by or with respect to it pursuant to all applicable Tax Laws. Seller, as appropriate, has paid, or made provision for the payment of, all Taxes that have or may have become due pursuant to those Tax Returns.

**5.11    No Material Adverse Change.**  Except for the specific changes disclosed on Schedule 5.11 hereto, there has not been any Material Adverse Change in the business, operations, properties, prospects, assets or condition of Seller, or the Business since June 30, 2011, and no event has occurred or circumstance exists that may result in such a Material Adverse Change.

**5.12    Employee Benefits.**  All qualified and other benefit plans maintained for the benefit of Seller's employees have been properly administered in accordance with all

applicable Laws, all contributions required to be made to such plans, except for approximately $13,000 that is owed to the IAM Pension Fund, have been timely made by Seller, all reports required to be made or filed in respect of such plans have been duly and timely made or filed and Seller and such plans in all other respects have complied with and are in compliance with all applicable Laws, including, without limitation, the Employee Retirement Income Security Act of 1974, as amended, and the Internal Revenue Code of 1986, as amended. Seller has obtained a favorable determination letter from the Internal Revenue Service for the ESOP, and no action or inaction by Seller has resulted in, or could result in, the revocation of such letter. No benefit plan maintained for the benefit of Seller's employees is the subject of an audit or any other inquiry from the Internal Revenue Service or the United States Department of Labor. Seller has not amended any of its Section 401(k) plans so as to cause the loss of such plan's prototype status. The Seller has withdrawn from the IAM Pension Fund prior to the date of this Agreement.

      **5.13    Compliance with Legal Requirements**. Seller is, and at all times during the previous five (5) years has been, in material compliance with all Laws that are or were applicable to it or to the conduct or operation of the Business or the ownership or use of any of the Purchased Assets. To Seller's Knowledge, no event has occurred or circumstance exists that (with or without notice or lapse of time) (a) may constitute or result in a material violation by Seller of, or a material failure on the part of Seller to comply with, any applicable Law, or (b) may give rise to any obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature, including under Laws related to or that would give rise to Environmental, Health and Safety Liabilities.

      **5.14    Legal Proceedings; Orders**. Other than Seller's Bankruptcy Case, no material suit, action, or proceeding by any third party or governmental authority with respect to the transactions contemplated hereby is pending or has been threatened, except for any such threat made by the Bank. No injunction, restraining order or order of any nature has been issued by or is the subject of any proceeding pending before any court of competent jurisdiction or any governmental authority challenging the validity or legality of the transactions contemplated hereby or restraining or prohibiting the consummation of such transactions or compelling Buyer to dispose of or discontinue or materially restrict the operations of any portion of the Business, or ownership or use of the Purchased Assets, as a result of the consummation of the transactions hereby.

      **5.15    Contracts; No Defaults**. Schedule 5.15 describes each Contract with respect to the Business that involves performance of services or the sale of goods by Seller, including each Contract that is a Purchased Contract. Each Purchased Contract identified in Schedule 5.15 is in full force and effect, is valid and enforceable in accordance with its terms, and Seller is in full compliance with all material terms and requirements of each such Contract.

      **5.16    Insurance**. Seller maintains and has maintained policies of insurance covering Seller, the Business and the Purchased Assets which, taken together, provide adequate insurance coverage for Seller and the Business.

**5.17    Personnel**.

        **5.17.1    Employees**. Schedule 5.17.1 contains a list of all employees of Seller (the "Employees"), setting forth each Employee's full name, date of hire, current position and job title and current compensation. All such personnel are treated as employees of Seller for all purposes and none are treated as independent contractors. Except as set forth in Schedule 5.17.1, each of the Employees is an at-will employee and none of the Employees is a party to an employment agreement with Seller.

        **5.17.2    Non-compete, Etc., Agreements.**    Schedule 5.17.2 describes all non-compete, non-solicitation, confidentiality, proprietary rights and similar agreements between Seller and its Employees and independent contractors, setting forth the names of each of the Employees or independent contractors subject to such agreements and providing the details thereof, and except as described on Schedule 5.17.2, no Employee or independent contractor is a party to, or is otherwise bound by, any agreement or arrangement (including any confidentiality, noncompetition or proprietary rights agreement), between such Employee or independent contractors and any Person other than Seller that in any way restricts or adversely affects the performance of his or her duties for Seller.

        **5.17.3    Compliance; No Claims**.    Seller has complied in all material respects with, and is now in compliance with, all applicable Laws relating to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, the payment of social security and similar taxes, occupational safety and health, and plant closing. There are no pending or threatened claims against Seller (and for the preceding five (5) years there have been no claims) by or involving any employee or employees of Seller claiming or alleging employment discrimination, violation of any Law involving wages and hours, or making or asserting any other employment-related claim. There are no current, pending or threatened employee strikes against Seller.

        **5.17.4    Labor Relations**.    There are no pending or threatened strikes by Employees or other labor disruptions and, to Seller's Knowledge, no such strikes or disruptions are planned.

        **5.17.5    Licenses, Etc**. Schedule 5.17.5 contains a complete and accurate list of all individual governmental or other licenses of each Employee required to enable such Employee to perform his or her duties for Seller. Each such license will continue to be valid and effective when the Employees become employed by Buyer.

**5.18    Intellectual Property Assets**.

        **5.18.1    Intellectual Property Assets**. Schedule 2.1.1(g) lists all Intangible Assets of Seller, including all Intellectual Property Assets. "Intellectual Property Assets" means all intellectual property owned or licensed by Seller with respect to or otherwise used in connection with the Business, including but not limited to: (a) the name "Mayville Die & Tool, Inc.," and all corporate and fictional business names, trading names, registered and unregistered trademarks, service marks and applications;

(b) all patents, patent applications and inventions and discoveries that may be patentable; (c) all copyrights in both published works and unpublished works; (d) all know-how, trade secrets, confidential information, technical information, data, process technology, plans and drawings; and (e) all software or other computer programs, codes or applications, including all licenses therefor.

**5.18.2    Ownership, Etc**. Seller is the owner of all right, title, and interest in and to each of the Intellectual Property Assets, entirely free and clear of all Interests, and has the unrestricted right to use all such Intellectual Property Assets without payment to any Person.  To Seller's Knowledge, none of such Intellectual Property Assets infringes the rights of any other Person.  All Intangible Assets listed in the Schedules by Seller are all of the Intangible Assets necessary for the conduct of the Business as it has been and is currently conducted.

**5.19    Illegal Payments**. For the past five (5) years, neither Seller nor any director, officer, agent, or employee thereof, nor any other Person associated with or acting for or on behalf of Seller, has directly or indirectly made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property or services, that is or was illegal under applicable law (a) to obtain favorable treatment in securing business, (b) to pay for favorable treatment for business secured, or (c) to obtain special concessions, or for special concessions already obtained, with respect to any business.

**5.20    Disclosure**.  No representation or warranty of Seller in this Agreement, and no information provided in the Schedules hereto, omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, not misleading.

**5.21    Brokers or Finders**. Neither Seller nor its Representatives have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement or any of the Contemplated Transactions.

**5.22    Environmental Matters**.  Except as disclosed in Schedule 5.22:

**5.22.1**      the business, operations and facilities (whether owned or leased) of Seller are in material compliance with all Environmental Laws;

**5.22.2**      Seller is in possession of all Environmental Permits necessary for the conduct or operation of the Business (or any part thereof), and is in material compliance with all of the requirements, conditions and limitations included in such Environmental Permits;

**5.22.3**      Seller has not used, managed, stored, transported or disposed of any Hazardous Material in, on, or at any of the properties or facilities owned or leased by Seller except in the ordinary course of business and in accordance with all applicable Environmental Laws and Environmental Permits;

- 20 -

**5.22.4** Seller has not received any written notice from any Governmental Body or any other Person that any past or present aspect of the Business, operations or facilities (whether owned or leased) of Seller is in violation of any Environmental Law or Environmental Permit, or that Seller is responsible or liable (or potentially responsible or liable) for the investigation, cleanup or remediation of any Hazardous Materials at any location;

**5.22.5** Seller is not the subject of any Proceeding in any forum, judicial or administrative, involving a demand for damages, injunctive relief, penalties, or other potential liability with respect to violations of or liability under any Environmental Law;

**5.22.6** Seller has timely filed all reports and notifications required to be filed with respect to all of its operations, properties and facilities (whether owned or leased) and has generated and maintained all required records and data under all applicable Environmental Laws;

**5.22.7** Seller has not transported or arranged for the transportation of any Hazardous Material to any location which is listed or proposed for listing on the National Priorities List pursuant to CERCLA or on any similar state list;

**5.22.8** there has been no release or threatened release of any material amount of any Hazardous Material on, upon, into or from any site currently or heretofore owned, leased or otherwise operated or used by Seller; and

**5.22.9** Seller has delivered to Buyer accurate and complete copies of all material environmental records, reports, notifications, certificates of need, permits, pending permit applications, correspondence, engineering studies, and environmental studies or assessments for the Company, in each case as amended and in effect.

**5.23 Ownership of Real Estate and Purchased Assets.** Except for mortgages and related encumbrance documents provided as collateral in favor of the Bank with respect to the real property included in the Purchased Assets, and liens for current real property taxes that are not yet due and payable, and except as set forth in Schedule 5.6, Seller owns full title to the Purchased Assets, including without limitation, the real property identified in Schedule 2.1.1(k), free and clear of any Interests. The real property listed on Schedule 2.1.1(k) constitutes all of the real property used by the Seller in and necessary for the conduct of the Business.

## VI. REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows, acknowledging that Seller is relying on such representations and warranties for purposes of this Agreement and the Contemplated Transactions:

**6.1 Organization and Good Standing.** Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, with full power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations.

- 21 -

**6.2     Authority; No Conflict.**

      **6.2.1          Binding Obligation.** This Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. Upon the execution and delivery by Buyer of the documents and instruments required of it pursuant to Section 4.2.2 (collectively, "Buyer's Closing Documents"), Buyer's Closing Documents will constitute the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms except as such enforceability may be limited by bankruptcy, insolvency or similar laws or by general principles of equity. Buyer has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and Buyer's Closing Documents and to perform its obligations hereunder and thereunder.

## VII.    COVENANTS OF THE PARTIES

**7.1     Restrictive Covenants.**

      **7.1.1          Term.** The term of the restrictive covenant provided for in this Section 7.1 (the "Term") shall commence on the date hereof and continue until the Closing Date.

      **7.1.2          Territory.** Seller represents and warrants to Buyer that Seller engages in the Business, and has Customers located, in the United States of America (the "Territory").

      **7.1.3          Restrictive Covenant.** During the Term, Seller covenants and agrees with Buyer that it and its officers and directors as of the date hereof, will not, directly or indirectly, or in association with any other Person, whether in a capacity as employee, officer, director, manager, agent, representative, consultant, shareholder, partner, limited liability company member, joint venturer or any other capacity, or through or in connection with any other Person, without the prior written consent of Buyer:

      (a)     Engage, in the Territory, in any business or activity competitive with or substantially similar to the Business;

      (b)     In the Territory, sell, agree to sell, provide or seek to provide any services or products which are substantially similar to or competitive with the services or products being sold or provided by Seller in connection with and as a part of the Business;

      (c)     Solicit, cater to or serve, or seek to solicit, cater to or serve, any Customer with services or products competitive with the services or products of the Business;

      (d)     Divert or attempt to divert, for the direct or indirect benefit of a covenanting party or any other Person, any Customer or any of the business or patronage of any Customer;

(e)     Influence or attempt to influence any Customer to transfer its business or patronage from Buyer directly or indirectly to any or all of the covenantors or any other Person;

(f)     Solicit or induce, or assist any other Person in any way to solicit or induce, any employee of Buyer to terminate his or her employment relationship with Buyer; or

(g)     In any other manner knowingly interfere with, disrupt or attempt to disrupt the relationship of Buyer with any of its Customers, suppliers or employees.

For purposes of this Section 7.1, the term "Customer" shall mean and include any Person that is a customer of Seller or Buyer on the date hereof or the Closing Date or was a customer of the same at any time during the preceding two (2) year period.

**7.1.4**     **Severability.** If a court of competent jurisdiction should declare any provision or provisions of this Section 7.1 unenforceable because any restriction herein is deemed to be unreasonable, whether because of duration, geographical scope or otherwise, then Buyer and Seller each hereby acknowledge and agree that such court shall have the express authority to reform the affected provisions of this Section 7.1 to provide for reasonable restrictions and/or to grant Buyer such other relief at law or in equity as may be reasonably necessary to protect the interests of Buyer in the Business being acquired pursuant to this Agreement.

**7.2**     **Employees**. Buyer may, but is not obligated to, offer employment, to become effective as of the Closing Date, to any of the Employees. Employees who are union members who accept such offer shall be entitled to participate in such benefit plans and programs as agreed in the new union contract to be negotiated between the union employees and the Buyer as described in Section 4.3(e) hereof. Non-union employees will be paid compensation and will participate in benefit plans and programs of the Buyer on terms as may be agreed upon between any such employee and the Buyer.

**7.3**     **Change of Name**. Immediately after the Closing, Seller shall take all steps necessary or desirable to legally change Seller's name to one other than "Mayville Die & Tool, Inc." or any name which is in any way similar to that name.

**7.4**     **Cooperation.** Buyer and Seller shall cooperate fully, as and to the extent reasonably requested by the other party or parties, in connection with the filing of Tax returns and any audit, litigation or other proceeding for any period ended on before or after the Closing Date. Such cooperation shall include the provision of Records in its or their possession which are reasonably relevant to any such audit, litigation or other proceeding and making employees reasonably available on a mutually convenient basis to provide additional information and explanation material thereto. It is understood and agreed, however, that no party to this Agreement will turn over to any Governmental Body any Records relating to any other party without that party's consent or in response to a subpoena issued by the Governmental Body.

**7.5    Bankruptcy Auction and Sale Process.**  This Agreement shall be subject to Bankruptcy Court approval.  This Agreement shall also be subject to higher and better offers for the Purchased Assets to be solicited at or before a public auction conducted by Seller consistent with Bankruptcy Court approval.    Accordingly, Seller shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sales Procedures Order and the Sale Order in the Bankruptcy Case.  Seller shall promptly make any filings, take all actions, and use its best efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets to Buyer.  Specifically, prior to Closing, (i) the Bankruptcy Court shall have entered the Sales Procedures Order in form and substance satisfactory to Buyer, and (ii) the Bankruptcy Court shall have entered the Sale Order in form and substance satisfactory to Buyer, which Sale Order, at the sole election of Buyer, shall be a final order which has not been reversed, modified, rescinded, or stayed as of the Closing.

   **7.5.1**   **Bankruptcy Petition and Sale Motion**.    Within five calendar days from the Agreement Date, Seller shall commence the Bankruptcy Case by filing a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code (the "Petition") with the United States Bankruptcy Court, Eastern District of Wisconsin (the "Bankruptcy Court"), and appropriate customary first-day motions, papers and pleadings, including but not limited to, the Sale Motion and DIP Financing Motion. In conjunction with such Sale Motion, Seller shall seek Bankruptcy Court approval of a Sales Procedures Order in a form acceptable to Buyer and consistent with the provisions of this Article 7. If the Petition, Sale Motion and Interim DIP Financing Motion are not filed within five calendar days of the Agreement Date and/or the Sales Procedures Order and the DIP Financing Order are not entered within 21 calendar days after the filing of the Petition, Buyer shall have the right to terminate this Agreement immediately upon written notice to Seller.

   **7.5.2**   **Sales Procedures Order**.    The Sales Procedures Order entered by the Bankruptcy Court in the Bankruptcy Case shall include, but not be limited to, an express provision approving the form and substance of this Agreement as well as the following procedures:

     (a)  <u>Qualifying Initial Overbids</u>.  For any initial overbid to constitute a qualified overbid, such overbid must:  (i) contain a signed definitive asset purchase agreement with, at a minimum, (A) a provision requiring the purchase of all of the Purchased Assets (without any break-up or similar fee), (B) providing for a cash amount which is at least fifteen percent (15%) greater than the Adjusted Purchase Price, (C) not being subject to any financing or uncompleted due diligence contingency, and (D) not being subject to any additional condition precedent not otherwise contained in this Agreement to the overbidder's purchase of the Purchased Assets; (ii) include a cashiers' or certified check or wire transfer in the amount of at least 10% of the proposed qualifying initial overbid as a good faith deposit; (iii) be received by Seller in writing by the close of the third business day before the auction date contemplated by the Sales Procedures Order; and (iv) be accompanied by financial information, satisfactory to

- 24 -

Seller in its reasonable discretion, demonstrating that such qualified initial overbidder has the ability to close the transaction.

(b)  Auction.  If Seller timely receives a conforming qualifying initial overbid prior to the deadline set forth in the Sales Procedures Order, then Seller shall conduct an auction with respect to the sale of the Purchased Assets.  At auction, qualified overbidders may submit successive bids in increments of at least $100,000 in value to the Seller's estate greater than the prior bid for the purchase of the Purchased Assets until there is only one offer that Seller determines, subject to Bankruptcy Court approval, is the highest and best offer.  When bidding at auction, Buyer shall receive a credit in the amount of the Break Up Fee (as defined below), which total credit shall be taken into account in determining the value of such incremental bid to the estate.  If no conforming qualifying initial overbid shall have been received at or prior to the applicable deadline, the auction will not be held and the hearing to approve the Sale Order will proceed with respect to this Agreement forthwith.

(c)  Break Up Fee.  Seller agrees that Buyer has expended substantial funds and other resources in connection with this transaction contemplated hereby, and that Buyer will suffer substantial harm if such transaction is not consummated, that the amount of such harm cannot be estimated, and that it would be unfair for Buyer to bear such harm in view of the fact that both Buyer and Seller intend to benefit from such transaction.  Accordingly, in the event this Agreement is terminated or the Closing is not consummated for any reason (other than, if the conditions to Buyer's obligations to close have been satisfied, a termination solely by Buyer's default), then neither Buyer nor any of its agents or representatives shall have any liability hereunder to Seller.  In addition to any other remedies Buyer may have, Seller, upon the date of consummation of any alternative sale, debt or equity refinancing or other material transaction with respect to the Purchased Assets involving a Person other than Buyer, shall (a) immediately refund any deposit by Buyer in connection with this Agreement, if any, and (b) indefeasibly pay to Buyer in immediately available funds $100,000 (the "Break Up Fee"), which Break Up Fee shall be payable from the very first proceeds of such other transaction(s) and prior to the attachment of any claim, lien, encumbrance or interest in such proceeds pursuant to any Bankruptcy Court order authorizing such alternative transaction(s).  The Break Up Fee shall be deemed a super-priority administrative expense claim against Seller's estate and superior to all other administrative claims against Seller.  Payment of the Break Up Fee shall be secured by a senior lien on the Purchased Assets.

**7.5.3**      **Assignment of Purchased Contracts.**  Seller shall file, serve and prosecute a motion in the Bankruptcy Case (as part of the Sale Motion or otherwise) seeking the assumption and assignment of all of Seller's interests in the

Purchased Contracts. Seller agrees that Buyer shall have no obligation to assume any Purchased Contract: (a) if Buyer is unwilling to pay the cure amounts, if any, as determined by the Bankruptcy Court or otherwise; (b) if Buyer provides written notice before or at the Closing that it wishes to delete certain Contracts from the list of Purchased Contracts; or (c) the Sale Order does not grant to Seller authority to assume and/or assign such Purchased Contracts to Buyer. In the event that a Purchased Contract is not assigned to Buyer as a result of Buyer's inability or failure to provide adequate assurance of future performance with respect to such Purchased Contract such non-assignment shall not constitute a default by Buyer hereunder. To the extent that, notwithstanding section 365 of the Bankruptcy Code, the assignment of any Purchased Contract or any Permit relating to the Business or the Purchased Assets to be assigned to Buyer pursuant to this Agreement shall require the consent of any other person, this Agreement shall not constitute a contract to assign the same if any attempted assignment would constitute a Breach thereof. Seller shall use all commercially reasonable efforts, and Buyer shall cooperate where appropriate, to obtain any consent necessary to any such assignment. If any such consent is not obtained, then Seller shall cooperate with Buyer in any reasonable arrangement requested by Buyer designed to provide Buyer the benefits under any such Purchased Contract, including, without limitation, enforcement of any and all rights of Seller against the other person thereto arising out of breach or cancellation thereof by such other person or otherwise.

7.5.4   **Notice of Agreement, Sale Motion, Etc.** Seller shall have served a copy of a notice of sale of the Assets to Buyer (which notice shall be satisfactory to Buyer) upon (a) all creditors and all other parties in interest in the Bankruptcy Case, (b) all current employees of Seller, (c) all persons with (or who have asserted) Interests in any of the Purchased Assets, (d) all persons who have notified Seller of claims or to Seller's knowledge, who have a reasonable basis to make claims against Seller, (e) sponsors and trustees under any pension or retirement plan for all current and former employees of Seller; (f) all persons who are currently or previously known to have been licensees or licensors of software or products designed, manufactured, tooled, or sold on behalf of Seller, or parties to any contracts or agreements with Seller, and (g) all other persons or parties in interest required to receive notice of the sale pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. Seller shall file an affidavit of such service with the Bankruptcy Court in the Bankruptcy Case.

7.5.5   **Intentionally Omitted.**

7.5.6   **Sale Order.** The Bankruptcy Court shall have entered an order in the Bankruptcy Case approving Seller's sale of the Purchased Assets to Buyer, which order shall have authorized and directed Seller to convey to Buyer all of its right, title and interest in and to the Purchased Assets entirely free and clear of any and all Interests. The Sale Order, which must be satisfactory in form and substance to Buyer, shall authorize and direct Seller to enter into and consummate this Agreement and the transactions contemplated herein in their entirety, and shall further provide, among other things, specific findings that:

(a) the transfers of the Purchased Assets by Seller to Buyer pursuant to this Agreement (i) are or will be valid, effective and enforceable transfers of the Purchased Assets, (ii) vest or will vest Buyer with good title to the Purchased Assets, entirely free and clear of any and all Interests pursuant to section 363(f) of the Bankruptcy Code, (iii) constitute the best and highest offer or value received by Seller for the Purchased Assets, and (iv) does not and will not subject Buyer to any liability as a successor of Seller;

(b) the Bankruptcy Court retains jurisdiction to enforce the provisions of this Agreement in all respects;

(c) the provisions of the Sale Order are non-severable and mutually dependent;

(d) the transactions contemplated by this Agreement are undertaken by Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code;

(e) pursuant to section 363(n) of the Bankruptcy Code, the consideration paid under this Agreement was not controlled by an agreement among potential bidders at the hearing;

(f) the terms and provisions of the Sale Order and this Agreement shall remain in full force and effect upon the dismissal or conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code;

(g) the Sale Order is effective immediately upon its entry, notwithstanding the period of the stay imposed pursuant to Bankruptcy Rule 6004(g); and

(h) the terms and provisions of the Sale Order and this Agreement shall be binding on all creditors and other parties in interest in the Bankruptcy Case.

At the sole election of Buyer, the Sale Order shall be a final order which has not been reversed, modified, rescinded or stayed as of the Closing Date. At the sole election of Buyer, the time to appeal the Sale Order shall no longer be subject to appeal or further judicial review. As of the Closing Date, there shall be no written objections filed with the Bankruptcy Court and not withdrawn or overruled in the Bankruptcy Case seeking to prohibit consummation of the transactions contemplated by this Agreement.

### 7.6 Pre-Closing Covenants.

**7.6.1 Operations During Pre-Closing Period.** From the date of this Agreement through the Closing Date ("Pre-Closing Period"), Seller shall maintain responsibility for the day-to-day operations of the Business and shall conduct the

Business only in the Ordinary Course of Business and use its commercially reasonable efforts to preserve and protect its business organizations, employment relationships and relationships with customers, strategic partners, suppliers, distributors and others having dealings with it; without limiting the generality of the foregoing, until the Closing, except as expressly permitted by this Agreement or as otherwise expressly consented to by Buyer in writing, Seller will not:

        (a)    Enter into, assume or become subject to any material contract;

        (b)    Amend, waive any right under, cancel or terminate any Purchased Contract or Governmental Authorization included in the Purchased Assets;

        (c)    Grant (or commit to grant) any increase in the compensation (including incentive or bonus compensation) of any employee employed by Seller or institute, adopt or amend (or commit to institute, adopt or amend) any compensation or benefit plan, policy, program or arrangement or collective bargaining agreement applicable to any such employee;

        (d)    Act or omit to act in a manner that would impair or otherwise adversely affect the Business, any of the Purchased Assets or Assumed Liabilities or the financial or other ability of such Seller to perform its obligations under this Agreement or any ancillary agreement related hereto;

        (e)    Otherwise take any action or omit to take any action, which action or omission would result in a Breach;

        (f)    Agree, whether in writing or otherwise, to do any of the foregoing.

        **7.6.2**        **Costs of Operations; DIP Financing Motion.** Seller shall be responsible for all costs of operating the Business during the Pre-Closing Period; *provided, however*, that upon execution of this Agreement, and for so long as there has not been any occurrence of any Breach by Seller or any other Termination Event, Buyer agrees to, directly or through one of its affiliates, prepay, on terms to be mutually agreed upon by Seller and Buyer, up to a cap equal to the amount of outstanding unpaid accounts receivable for invoices issued as of the date of this Agreement by Seller to Buyer or such affiliate, as the case may be. In addition, Buyer may, but is not obligated to, directly or through one of its affiliates, advance certain additional funds to Seller in accordance with and subject to the conditions set forth below in this Section 7.6.2 (collectively, the "Advances").

        (a)    Any Advance is expressly conditioned upon Seller having provided to Buyer, by the close of business on the second business day of each week for the immediately preceding week: (i) a report of all cash

receipts by Seller (showing the date, amount, payee, source and purpose for each); (ii) a list of all disbursements by Seller (showing the date, amount, payee and purpose for each); (iii) a list of all accrued, unpaid expenses and costs of Seller, its agents and/or its estate; (iv) copies of all invoices issued by Seller; (v) copies of all orders to purchase Finished Products from Seller; and (vi) such other reports as Buyer may request from time to time. Upon receipt of the foregoing reports, Buyer may, but is not obligated to, in its sole and absolute discretion, (x) pay or cause to be paid such amount of the accounts receivable of Seller which have been invoiced to Buyer or its affiliates (whether or not such invoice is yet due) related to Finished Products, or if no such accounts receivable exist, either (y) provide to Seller prepayments of work purchase orders placed by Buyer or such affiliate, as the case may be, with Seller after the filing of the Bankruptcy Case or (z) make discretionary short-term loans in response to specific written requests by Seller for credit support.

(b) Any Advances made pursuant to this Section 7.6.2 shall be used only for such short term cash needs that are absolutely necessary for Seller to maintain the day-to-day operations of the Business in the Ordinary Course of Business during the Pre-Closing Period.

(c) For the avoidance of doubt, no Advances or the proceeds thereof shall be used for the purpose of (i) satisfying any indebtedness of Seller owed to Bank, (ii) paying any indebtedness of Seller owed to holders of prepetition unsecured claims against Seller or its estate or (iii) making any distribution or declaring any dividend to its shareholder or paying any bonus or increase in compensation to any employee.

(d) It is understood and agreed by the parties that all Advances (except for advance payments of accounts receivable in accordance with Section 7.6.2(a), clause (x)) are subject to reimbursement by Seller through a dollar-for-dollar adjustment to the purchase price in accordance with Section 3.1.2.

(e) Seller shall file, as a first-day motion, the DIP Financing Motion, seeking expedited approval of an order granting the DIP Financing Motion, which order entered by the Bankruptcy Court must provide that Buyer is deemed to have, in respect of the amount of any outstanding Advances: (i) an administrative claim against Seller's estate pursuant to section 364(c)(1) of the Bankruptcy Code (*provided, however,* that if Buyer is not the Prevailing Bidder at the Auction, and its liens in the sale proceeds are not sufficient to pay all of Buyer's aforementioned administrative claim against the estate, Buyer agrees not to pursue payment of such administrative claim until the reasonable fees and related expenses of Seller's bankruptcy counsel of record in the Bankruptcy Case, as approved by the Bankruptcy Court, are paid in full); (ii) a perfected security interest in and lien upon all unencumbered property of the Seller's

estate pursuant to section 364(c)(2) of the Bankruptcy Code; and (iii) a junior lien on all encumbered property of the Seller's estate pursuant to section 364(c)(3) of the Bankruptcy Code.

**7.6.3** **Environmental Report.** Seller shall provide Buyer with reasonable access to the Property to conduct a Phase II environmental assessment ("Phase II ESA") pursuant to a scope of work that conforms to the scope of the American Society for Testing and Materials ("ASTM") standard E 1527-05.

## VIII.  SURVIVAL; REMEDIES

**8.1** **Survival**. All representations, warranties, covenants, and obligations in this Agreement, the Schedules, any supplements to the Schedules, and any certificates or other documents delivered pursuant to this Agreement will survive the Closing. The right of a party to any remedies based on such representations, warranties, covenants, obligations, Schedules, supplements to Schedules, certificates and other documents will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of being acquired) by such party at any time, whether before or after the execution and delivery of this Agreement or the Closing Date. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect a party's right to any remedy based on such representation, warranty, covenant, or obligation.

**8.2** **Remedies.** Seller agrees with Buyer that:

(a)    In the event of a Breach of any or all of the provisions of this Agreement by Seller, that Buyer's remedies for such Breach (including its right to injunctive relief as provided for below) may be enforced against the breaching party or parties in any court of competent jurisdiction;

(b)    In the event of any Breach of any or all of the provisions of this Agreement by Seller, that Buyer shall have the right to enter the premises of Seller, without impediment or delay, and remove any and all Buyer Blocks and Finished Product designated as part of Buyer's account with Seller as required by Section 3.1.2; and

(c)    Damages are not an adequate remedy for a Breach by Seller of any of the terms of this Agreement.  Therefore, in the event of any such Breach or threatened Breach, and in addition to remedies to which Buyer is entitled at law, Buyer shall be entitled to an injunction restraining Seller from such act or conduct in addition to such other remedies as may be available to Buyer for such Breach.

## IX.  GENERAL PROVISIONS.

**9.1** **Expenses**. Each party to this Agreement will bear its or their respective own expenses incurred in connection with the preparation, execution, and performance of this

Agreement and the Contemplated Transactions, including all fees and expenses of their respective Representatives; *provided, however*, Seller or Seller's estate shall be obligated to pay any Break Up Fee pursuant to the terms and conditions of Section 7.5.2(c). With respect to the transfer of real estate included as part of the Purchased Assets, transfer taxes and costs associated with the Real Estate Documents shall be allocated to the respective parties in accordance with local custom and practice.

      **9.2**    **Public Announcements.** Except with respect to the filing by Seller of papers, pleadings or other submissions in the Bankruptcy Case, any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions shall be first submitted to Buyer for its prior review, comment and approval, which approval shall not be unreasonably withheld.

      **9.3**    **Notices**. All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), provided that a confirmation copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service, in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may designate by notice to the other parties):

| | |
|---|---|
| If to Buyer: | Mayville Asset Acquisition, LLC<br>2011 N. Southport Avenue<br>Chicago, Illinois 60614<br>Attention: Joseph E. Curci<br>Facsimile No.: 773-348-5347 |
| With a copy to: | McGuireWoods LLP<br>77 West Wacker Drive<br>Suite 4100<br>Chicago, IL 60601<br>Attention: Donald J. Gibson, Jr.<br>dgibson@mcguirewoods.com<br>Facsimile No: (312) 920-6592 |
| If to Seller: | Mayville Die & Tool, Inc.<br>700 N. Furnace Street, P.O. Box 113<br>Mayville, Wisconsin 53050-0113<br>Attention: Glen Helmbrecht<br>Facsimile No.: 920-387-3414 |

<table>
<tr><td>with a copy to:</td><td>Murphy Desmond S.C.<br>33 E. Main St., Suite 500<br>PO Box 2038<br>Madison, WI 53703<br>Jane Zimmerman<br>Jzimmerman@murphydesmond.com<br>Facsimile No.: (608) 257-4333</td></tr>
</table>

**9.4    Termination.**  The Agreement may also be terminated by Buyer, in its sole and absolute discretion, upon written notice from Buyer to Seller, if (each event constituting a "Termination Event"):

  (a)    the Bankruptcy Case is dismissed or converted to chapter 7 of the Bankruptcy Code or a trustee is appointed for Seller;

  (b)    an interim order granting the DIP Financing Motion, in form and substance satisfactory to Buyer, shall not have been timely entered as required hereunder;

  (c)    the Sales Procedures Order, in form and substance satisfactory to Buyer, shall not have been timely entered as required hereunder;

  (d)    the Sale Order, in form and substance satisfactory to Buyer, shall not have been timely entered as required hereunder;

  (e)    any Breach by Seller has occurred;

  (f)    Seller fails to satisfy any or all of the conditions set forth in Section 4.3 of this Agreement;

  (g)    the Closing Date does not occur by December 1, 2011;

  (h)    the Employees, or any union representing the Employees, strikes or threatens to strike,

  (i)    there occurs any other Material Adverse Change;

  (j)    the Buyer is required by order of the Bankruptcy Court to fund amounts in excess of the Purchase Price for distributions to general unsecured creditors of Seller's bankruptcy estate;

  (k)    a Person other than Buyer is the Successful Bidder at the conclusion of the Auction;

  (l)    the Bankruptcy Court enters an order, whether or not final or appealable, approving an alternative sale, debt or equity financing or

material transaction with respect to the Purchased Assets with any Person other than Seller; or

(m)   the consummation of any alternative sale, debt or equity financing or material transaction with respect to the Purchased Assets with any Person other than Seller.

**9.5   Further Assurances**. The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

**9.6   Waiver**. Except as otherwise provided herein, the rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. Except as otherwise provided herein, to the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the party for whose benefit the claim or right exists or is made; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

**9.7   Entire Agreement and Modification**. This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

**9.8   Assignments; Successors; No Third-Party Rights**. Neither party may assign any of its rights under this Agreement without the prior consent of the other parties, except that Buyer may assign any of its rights under this Agreement to any parent, subsidiary or other affiliate of Buyer. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and permitted assigns.

**9.9     Section Headings; Construction**. The headings of Articles and Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Article," "Articles," "Section" or "Sections" refer to the corresponding Article, Articles, Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

**9.10     Governing Law**. Wisconsin law (without regard to any jurisdiction's conflict-of-laws principles) exclusively governs all matters based upon, arising out of, or relating in any way to this Agreement, including, without limitation, all disputes, claims, or causes of action arising out of or relating to this Agreement as well as the interpretation, construction, performance, and enforcement of this Agreement.

**9.11     Jurisdiction.**   The parties hereby agree that, without limitation of any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder or the transactions contemplated herein; and (b) any and all claims, causes of action, suits and proceedings relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent and submit to the jurisdiction of the Bankruptcy Court and shall receive notice at such locations as indicated in the notices section hereof.

**9.12     Counterparts**. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**[Balance of Page Intentionally Left Blank]**

*Signature Page of Asset Purchase Agreement*

**IN WITNESS WHEREOF,** the parties have executed and delivered this Agreement as of the date first written above.

**BUYER:**

**MAYVILLE ASSET ACQUISITION, LLC**

By: _____

Name: Joseph E. Curci

Its: Manager

**SELLER:**

**MAYVILLE DIE & TOOL, INC.**

By: _____

Name: Glen Helmbrecht

Its: President

*Signature Page of Asset Purchase Agreement*

**IN WITNESS WHEREOF,** the parties have executed and delivered this Agreement as of the date first written above.

BUYER:

MAYVILLE ASSET ACQUISITION, LLC

By: _____

Name: Joseph E. Curci

Its: Manager

SELLER:

MAYVILLE DIE & TOOL, INC.

By: _Glen Helmbrecht (signature)_

Name: Glen Helmbrecht

Its: President

**Schedule 2.1.1(b)**
**Tangible Personal Property**

**Mayville Die & Tool, Inc.**

See attached.

Appraisal -- Mayville Die & Tool, Inc.
Mayville Wisconsin
Effective Appraisal Date: January 26, 2011

| ITEM | QTY | DESCRIPTION |
|------|-----|-------------|
| 1. | 1 | 1998 Cosen SH-2028F Horizontal Metal Cutting Band Saw, SN F872033, Clamping Fixture, Conveyor System, etc. |
| 2. | 1 | Rockwell/Delta Vertical Metal Cutting Band Saw, 20" Throat, 24" x 24" Table, etc. |
| 3. | 1 | M81 Cincinnati Milacron 20x120 Hydrotel CNC Vertical Production Mill, SN 85-4150211, Travels: 120"-X, 32"-Y, 18"-Z, 25 hp, 2200 RPM Spindle, 26"UW, T-Slotted Table, 150 IPM Rapid Travel, CNC Controls, etc. |
| 4. | 1 | M23 Summit VTL, SN 141, 60"-Diameter, 62 hp, 29" Under Cross Rail, 4-203 RPM, etc. |
| 5. | 1 | M5 Cincinnati Hydro-tel Hydraulic Vertical Production Mill, SN 1H8V5R-11, Travels: X-120", Y-40", Z-18", 25 hp, 750 RPM Spindle, 28" x 97" T-Slotted Table, 150 IPM Rapid Travel, Newall DP7 3-Axis DRO, etc. |
| 6. | 1 | WM. Sellers & Co. Planer Mill, (2) Rail Heads, (1) Side Rail Head, 44" x 195" T-Slotted Table, etc. |
| 7. | 1 | DoAll #26 Vertical Metal Cutting Band Saw, SN 26461624, 26" Throat, 30" x 30" Table, Blade Weld Attachment, etc. |
| 8. | 1 | M73 1995 Southwestern Trak DPM Vertical Milling Machine, SN 95-2107, 3 hp Variable Speed Head, 10" x 60" T-Slotted Table, Proto Trak MX3 Controls, etc. |
| 9. | 1 | Jet CBS-1340 Geared Head Engine Lathe, SN 321446, 13" Swing, 40" cc, etc. |
| 10. | 1 | MEC 2033ES Electric Scissor Lift, 20' Platform Reach, Extended Platform, Non-Mark Tires, etc. |
| 11. | 1 | M107 G&L 80 DP6 5" Horizontal Table Type Boring Bar, SN 150-1456, Travels: 117"-X, 96"-Y, Z-40", 60" x 120" T-Slotted Table, Heidenhain 3-Axis DRO, 25 hp, etc. |

2 - 1

| ITEM | QTY | DESCRIPTION |
|------|-----|-------------|
| 12. | 1 | 2008 Faro Fusion Portable CMM, SN U12-05-08-06986 |
| 13. | 1 | M83<br>Cincinnati Horizontal Hydro-tel Mill, SN 58-409-R-535-1, 45" x 160" T-Slotted Table, Travel: 120"-X, 96"-Y, 18"-Z, 25 hp, 900 RPM Spindle, Newall DP700 3-Axis DRO, etc. |
| 14. | 1 | M8<br>Cincinnati Milacron CNC 40x120 Hydrotel Vertical Production Mill, SN 31341V75-004, Travels: 40" x 158" T-Slotted Table, 120"-X, 40"-Y, 18"-Z, 2200 RPM Spindle, 34" UW, Heidenhain Controls, etc. |
| 15. | 1 | M76<br>Cincinnati 30/40 Hydrotel CNC Vertical Production Mill, SN 31341V42-0005, Travels: 120"-X, 40"-Y, 18"-Z, 25 hp, 3000 RPM Spindle, 26" UW, 40" x 158" T-Slotted Table, Pro-Face XY Com Controls, 150 IPM Rapid Travel, etc., (Major Repairs in 2009) |
| 16. | 1 | M91<br>Titan SC2500 CNC VTL, SN 2008703, (2) Rail Heads, 100" Diameter Table, Travels: 150 hp, 72" Under Cross Rail, 98" Table, 1.12-112 RPM, MDSI OPENCNC Controls, Incline Chip Conveyor, etc., (Major Retrofitted and Repairs in 2008-2010) |
| 17. | 1 | M98<br>Titan SC2700 CNC VTL, SN 389, 74" Under Cross Rail, 120" Table, 80 hp, (2) Heidenhain Controls, Incline Chip Conveyor, etc. |
| 18. | 1 | International Cabover Tri-Axle Flatbed Truck, Diesel Engine, Manual Transmission, etc. |
| 19. | 1 | M109<br>Cincinnati Hydrotel CNC Vertical Mill, SN 31331V5W-3, 40" x 132" T-Slotted Table, Travels: 96"-X, 40"-Y, 18"-Z, 25 hp, 2200 RPM Spindle, 32" UW, Heidenhain Controls, 150 IPM Rapid Travel, etc. |

2 - 2

| ITEM | QTY | DESCRIPTION |
|------|-----|-------------|
| 20. | 1 | M11<br>Cincinnati Milacron CNC 40" Hydrotel Vertical Mill, SN 84-4120995-1, 40" x 156" T-Slotted Table, Travels: 120"-X, 40"-Y, 18"-Z, 25 hp, 2200 RPM Spindle, 36" UW, INCON CAT Controls, 150 IPM Rapid Travel, etc., (Retrofitted in 2004) |
| 21. | 1 | M86<br>Cincinnati Milacron 32X120 Hydrotel CNC Vertical Mill, SN 3134V78-0009, 40" x 158" T-Slotted Table, Travels: 120"-X, 40"-Y, 18"-Z, 25 hp, 3000 RPM Spindle, 26" UW, etc. |
| 22. | 1 | M97<br>Cincinnati Milacron Vertical Mill, SN 31341V78-0006, 40" x 156" T-Slotted Table, Travels: 120"-X, 40"-Y, 18"-Z, 25 hp, 2200 RPM Spindle, 36" UW, Heidenhain Controls, 150 IPM Rapid Travel, etc. |
| 23. | 1 | Yale GLC050RDJUAE083 LP Gas Forklift, SN Y458499, 5,000 Lb. Capacity, 190" Lift, 3-Stage Mast, Solid Tires, etc. |
| 24. | 1 | 1976 G&L Bickford Radial Arm Drill, SN 95600298-76, 22" Column, 7' Arm, L-Shaped Table with (1) T-Slotted Riser Block, etc. |
| 25. | 1 | M111<br>Wotan 6" Horizontal Floor Type Manual Boring Bar, SN 55.017, Travels: 34'-X, 120"-Y, 40"-Z, 95 hp, 900 RPM Spindle, etc., (Retrofitted in 2002) |
| 26. | 1 | M108<br>Toshiba BFD-200 CNC Horizontal Floor Type Boring Mill, SN 910119, Travels: 45'-X, 120"-Y, 39"-Z, 120 hp, 3000 RPM Spindle, Multiple Heads, 600 IPM Rapid Travel, etc., (Retrofitted 2002-2010) |
| 27. | 1 | M120<br>PARPAS ML130 CNC Horizontal Boring Mill, SN 20ML130/2, Travels: 197"-X, 98"-Y, 50"-Z, 50 hp, 4,000 RPM Spindle, 315 IPM Rapid Travel, etc. |

2 - 3

| ITEM | QTY | DESCRIPTION |
|------|-----|-------------|
| 28. | 1 | M12<br>1988 Cincinnati Milacron 40" Vertical Hydrotel Mill, SN 88-4170865-1, Travels: 120"-X, 40"-Y, 18"-Z, 25 hp, 2200 RPM Spindle, 36" UW, 90" x 158" T-Slotted Table, Heidenhain Controls, etc., (Upgrades and Rebuilds 1999-2006) |
| 29. | 1 | 2008 Electro-Magnet Crane Magnet |
| 30. | --- | Crane System to Include: (1) P&H Top Rail Mounted Double Beam Overhead Bridge Crane, SN CJ34366FC, 60-Ton, Radio Controlled, 18' Under hook, 50' Span, (1) P&H Top Rail Mounted Double Beam Overhead Bridge Crane, SN CE26825, 25-Ton, Pendant Controls, 50' Span, (1) Top Rail Mounted Double Beam Overhead Bridge Crane, 10-Ton, Pendant Controls, 50' Span, etc. |
| 31. | --- | Compressor System to Include: (1) Gardner Denver Rotary Screw Air Compressor, 50 hp, (1) Kaiser BS-61 Rotary Screw Air Compressor, 50 hp, Receiving Tank, Air Dryer, etc. |
| 32. | --- | Support Equipment to Include, But Not Limited to, Horizontal Surface Grinders, Drill Presses, H-Frame Hydraulic Straightening Press, Shop Fans, Workbenches, Machinist and Bench Vises, Hand & Power Tools, Battery Chargers, Pressure Washer, Torch Carts, Dymodrill, Die & Lift Tables, Stock Racks, Miter Saw, Table Saw, Welding Power Sources, Heavy Duty Rigging Chains and Straps, Banding Carts, Angle Plates, Machine Tooling and Holders, Tool & Cutter Grinders, Double End Grinders, Fume Extractors/Filters, Barrel Racks, Lifting Magnets, Office Furniture and Business Machines, etc. |

**TOTAL APPRAISED VALUE:**

2 - 4

Sch B

| VEHICLE IDENTIFICATION NUMBER | YEAR | MAKE | BODY STYLE | VEHICLE TYPE | FLEET NUMBER | |
|---|---|---|---|---|---|---|
| 1HTL23270DGA10596 | 1983 | INTL | | TRUK | | TRK PB2929 |

| TITLE NUMBER | DATE TITLE ISSUED | ODOMETER | ODOMETER DATE |
|---|---|---|---|
| 00025NF004-5 | 02/02/2000 | THIS VEHICLE IS EXEMPT FROM ODOMETER DISCLOSURE | |

REGISTERED OWNERS

MAYVILLE DIE AND TOOL INC
PO BOX 113 700 FURNACE
MAYVILLE, WI 53050

The person, firm or corporation named on this Title has been duly registered as the lawful owner of the vehicle described, subject to any Security Interest (liens) shown. The order in which the Security Interests appear on this Title does not necessarily represent their priority.

SECURED PARTY

PREVIOUSLY TITLED IN OH

CONTROL NUMBER
(This is not a Title Number)

9-0772768

DIVISION OF MOTOR VEHICLES

Important - Buyer and Seller must complete the section below at time of sale

## TITLE ASSIGNMENT AND MILEAGE, SELLING PRICE AND BRAND DISCLOSURE
### BY REGISTERED OWNER(S) SHOWN ABOVE

Federal and State law requires that SELLER state the mileage and provide written disclosure information in connection with transfer of ownership. Failure to complete a mileage statement, disclose required information, or providing a false statement may result in fines and/or imprisonment and may make you liable for damages to the transferee (buyer).

SELLER (Print Person(s) Name signing as Seller

ODOMETER NOW READS (No Tenths)
and to the best of my knowledge is
actual mileage of this vehicle unless one of the following statements is checked.

Print Seller's Address, City, State, Zip if different than shown above

☐ The odometer reading reflects the amount of mileage in excess of its mechanical limit.
☐ The odometer reading is NOT actual mileage. WARNING ODOMETER DISCREPANCY

BRAND DISCLOSURE (will be printed on future titles) Check all that apply.
☐ Flood damaged vehicle   ☐ Previous police vehicle
☐ Previous taxicab        ☐ Salvage vehicle

I, the seller, certify that to the best of my knowledge the information contained on this document is true and correct and that I have entered the vehicle odometer reading, brand disclosure, and selling price hereon in compliance with federal and state law as referenced above. For value received, I hereby sell, assign or transfer the vehicle described on this document and warrant title to Purchaser as shown.

Signature of Seller(s). See "REGISTERED OWNERS" above. If joint ownership with "or", only one seller's signature required; with "and", all seller's signatures required.

X _____
X _____   Date

SELLING PRICE (Seller enter): $ |__|__|__,|__|__|__|

BUYER (Purchaser) Print Name(s)

If Buyer is a business, Print Name of authorized person signing as Purchaser

Print Buyer Address, City, State, Zip

Signature of Purchaser(s)
X _____   Date
X _____

If registered owner is a dealer and first assignment is through auction or salvage pool, complete the following.
Print Consigning Auction Dealer Name or Consigning Salvage Pool Name   Auction or Salvage Pool Dealer No.   Sale Date

The Wisconsin Department of Transportation will not be responsible for false or fraudulent odometer statements made in the assignment of the Certificate of Title or for errors in recording by the department. The department makes no warranties, express or implied, about the vehicle or operating condition and any statements about vehicle inspections are fully administrative.

PURCHASER - Attach form MV1 (Wisconsin Application for Title) to this document and mail or deliver immediately to the Wisconsin Department of Transportation. Form MV1 is available at Wisconsin DMV Service Centers and police stations.
MV2069 597(5)   pursuant to ch 342 Wis Stats

MAIL ADDRESS - Wisconsin Dept. of Transportation, P.O. Box 7949, Madison, WI 53707-7949

QUESTIONS - Contact nearest Motor Vehicle Service Center or call (608) 266-1466

ANY ALTERATION OR ERASURE VOIDS THIS TITLE. KEEP IN A SAFE PLACE.
Seller must give to purchaser at time of sale.

# WISCONSIN CERTIFICATE OF TITLE FOR A VEHICLE
## DEPARTMENT OF TRANSPORTATION

| VEHICLE IDENTIFICATION NUMBER | YEAR | MAKE | BODY STYLE | VEHICLE TYPE | FLEET NUMBER | |
|---|---|---|---|---|---|---|
| 1B7HC16X2WS719445 | 1998 | DODGE | | TRUK. | | ATK BH37338 |

| TITLE NUMBER | DATE TITLE ISSUED | | |
|---|---|---|---|
| 981647P181-6 | 06/14/98 | | |

ODOMETER
9
DISCLOSED AS ACTUAL

ODOMETER DATE
05/27/98

REGISTERED OWNERS

MAYVILLE DIE AND TOOL INC
700 N FURNACE ST
MAYVILLE, WI 53050

The person, firm or corporation named on this Title has been duly registered as the lawful owner of the vehicle described, subject to any Security Interest (liens) shown. The order in which the Security Interests appear on this Title does not necessarily represent their priority.

SECURED PARTY

CONTROL NUMBER
(This is not a Title Number)

7-1671322

DIVISION OF MOTOR VEHICLES

---

## Important - Buyer and Seller must complete the section below at time of sale
## TITLE ASSIGNMENT AND MILEAGE, SELLING PRICE AND BRAND DISCLOSURE
### BY REGISTERED OWNER(S) SHOWN ABOVE

Federal and State law requires that SELLER state the mileage and provide written vehicle disclosure information in connection with transfer of ownership. Failure to complete a mileage statement, disclose required information, or providing a false statement may result in fines and/or imprisonment and may make you liable for damages to the transferee (buyer).

SELLER (Print Person(s) Name signing as Seller

Print Sellers Address, City, State, Zip if different than shown above

ODOMETER NOW READS (No Tenths):
and to the best of my knowledge is
actual mileage of this vehicle unless one of the following statements is checked.

☐ The odometer reading reflects the amount of mileage in excess of its mechanical limit.

☐ The odometer reading is NOT actual mileage.
WARNING ODOMETER DISCREPANCY

I, the seller, certify that to the best of my knowledge the information contained on this document is true and correct and that I have entered the vehicle odometer reading, brand disclosure, and selling price hereon in compliance with federal and state law as referenced above. For value received, I hereby sell, assign or transfer the vehicle described on this document and warrant title to Purchaser as shown.

Signature of Seller(s). See "REGISTERED OWNERS" above. If joint ownership with "or", only one seller's signature required with "and", all seller's signatures required.

BRAND DISCLOSURE (will be printed on future titles) Check all that apply:
☐ Flood damaged vehicle
☐ Previous police vehicle
☐ Previous taxicab
☐ Salvage vehicle

X _____
X _____
Date

SELLING PRICE (Seller enter): $ |__|__|__|__|__|__|__|__|

BUYER (Purchaser) (Print Name(s)

Print Buyer Address, City, State, Zip

If Buyer is a business, Print Name of authorized person signing as Purchaser

Signature of Purchaser(s)

X _____
Date
X _____

If registered owner is a dealer and first assignment is through auction or salvage pool, complete the following.
Print Consigning Auction Dealer Name or Consigning Salvage Pool Name

Auction or Salvage Pool Dealer No.

Sale Date

The Wisconsin Department of Transportation will not be responsible for false or fraudulent odometer statements made in the assignment of the Certificate of Title or for errors in recording by the department. The department makes no warranties, express or implied, about the vehicle or operating condition and any statements about vehicle inspections are only administrative.

PURCHASER - Attach form MV1 (Wisconsin Application for Title) to this document and mail or deliver immediately to the Wisconsin Department of Transportation. Form MV1 is available at Wisconsin DMV Service Centers and police stations.

MV2UiS  99/(2)     Pursuant to ch. 342, Wis. Stats.

MAIL ADDRESS - Wisconsin Dept. of Transportation, P.O. Box 7949, Madison, WI 53707-7949

QUESTIONS - Contact nearest Motor Vehicle Service Center or call (608) 266-1466

## ANY ALTERATION OR ERASURE VOIDS THIS TITLE - KEEP IN A SAFE PLACE
(Seller must give to purchaser at time of sale)

| 78 | COMPUDYNE 486 DX2/66 COMPUTER |
| 81 | COMPUTER UPGRADE |
| 82 | TRIG PENTIUM 75MHZ COMPUTER |
| 94 | COMPUTER-STATION #3 |
| 101 | CAD CAM COMPUTER |
| 107 | CAD computer #5 |
| 108 | CAD computer #6 |
| 109 | CAD computer #7 |
| 110 | Network – shop & office |
| 111 | Catlink silver #1 |
| 112 | Catlink silver #2 |
| 113 | Catlink silver #3 |
| 114 | Cadlink silver #4 |
| 115 | Catlink silver #5 |
| 116 | Work NC Cam software #1 |
| 117 | Work NC Cam software #2 |
| 118 | JP Deskjet 380 plotter |
| 129 | CAD computer #4 |
| 131 | WORK NCCAM SOFTWARE #3 |
| 132 | CAD COMPUTER #8 |
| 133 | CAD COMPUTER #9 |
| 134 | FURNITURE |
| 148 | MTNCE/UPGRADE #010 |
| 149 | GARY'S LAPTOP |
| 150 | GREG'S COMPUTER |
| 151 | XEROX BLUEPR #2510 COPIER |
| 162 | GARY'S OFFICE COMPUTER |
| 156 | COMPUTER-JILL'S OFFICE |
| 163 | COMPUTER-SALTY'S OFFICE |
| 174 | CATITA VERSION 5 |
| 184 | PARNTER II REVISION 3 – NEW PHONE |
| 196 | CHAD-CATIVA NEW COMPUTER |
| 197 | COMPAQ-GARY'S LAPTOP |
| 198 | CAD ROOM COMPUTER |
| 199 | CAD ROOM BACK-UP COMPUTER |
| 224 | PRINTER HP DESIGN PLOTTER T610 44 |
| 225 | COMPUTER 037 |
| 226 | OFFICE FURNITURE (DESK) – 038 |
| 227 | COMPUTER – 039 |
| 228 | SERVER – 040 |

**Schedule 2.1.1(c)**
**Inventory**

**Mayville Die & Tool, Inc.**

See attached.

| ITEM | QTY. | PRICE EA. | TOTAL |
|------|------|-----------|-------|
| TEMPLATE STOCK 3' X 10' | 0 | $25.84 | $0.00 |
| TEMPLATE STOCK 4' X 8' | 0 | $37.28 | $0.00 |
| EXPANDED METAL | 0 | $29.89 | $0.00 |
| ALUMINUM 4' X 8' | 2 | $78.10 | $156.20 |
| OBS BOARD 4' X 8' X 7/16" | 2 | $13.49 | $26.98 |
| 2" X 4" | 5 | $3.10 | $15.50 |
| 2" X  2" X 8" STRIPS | 6 | $2.05 | $12.30 |
| HYDROCAL (BAGS) | 20 | $16.00 | $320.00 |
| 12.625" DIA. PIN STOCK | 55 | $36.34 | $1,998.70 |
| 9" DIA. PIN STOCK | 48 | $33.35 | $1,600.80 |
| 8" DIA PIN STOCK | 156 | $27.11 | $4,229.16 |
| 7" DIA. PIN STOCK | 60 | $20.04 | $1,202.40 |
| 6 1/2" DIA. PIN STOCK | 0 | $16.51 | $0.00 |
| 6 DIA. PIN STOCK | 276 | $18.26 | $5,039.76 |
| 5 1/2" DIA PIN STOCK | 0 | $14.83 | $0.00 |
| 5" DIA PIN STOCK | 168 | $12.83 | $2,155.44 |
| 4 1/2" DIA. PIN STOCK | 0 | $9.73 | $0.00 |
| 4" DIA, PIN STOCK | 48 | $9.29 | $445.92 |
| 4" DIA 1018 STOCK | 48 | $5.03 | $241.44 |
| 3 1/2" DIA 1018  STOCK | 0 | $2.56 | $0.00 |
| 3 1/4 " DIA.  STOCK (Accurloy) | 0 | $8.93 | $0.00 |
| 3" DIA. 1018 STOCK | 96 | $1.90 | $182.40 |
| 3" DIA. PIN STOCK | 0 | $5.69 | $0.00 |
| 3 " DIA. PIN STOCK (Accurloy) | 25 | $7.31 | $182.75 |
| 2 1/2" DIA. PIN STOCK | 0 | $4.39 | $0.00 |
| 2 1/2" DIA. 1018 STOCK | 0 | $1.77 | $0.00 |
| 2" DIA DRILL ROD | 0 | $2.60 | $0.00 |
| 1" DRILL ROD | 108 | $1.09 | $117.72 |
| COAL SAG / SHOT BLASTING | 41 | $14.31 | $586.71 |
| 1 1/2" DRILL ROD | 96 | $2.35 | $225.60 |
| 1 1/4" DRILL ROD | 84 | $1.71 | $143.64 |
| 1 1/4" DRILL ROD | 72 | $1.28 | $92.16 |
|  |  |  | $0.00 |

|  |  | TOTAL | $18,975.58 |
|--|--|-------|-----------|
| **Consumed(10/01/10-07/31/11)** |  |  | $6,361.05 |
|  |  |  | $12,614.53 |

C:\Documents and Settings\rdemarb\Local Settings\Temporary Internet Files\Content.Outlook\HVDS57BE\2010 INVENTORY

## Schedule 2.1.1(e)
## Purchased Contracts

## Mayville Die & Tool, Inc.

All contracts listed in Schedule 5.15 except for any contract with District Lodge 10 of the International Association of Machinists and Aerospace Workers, Local Lodge DS 2053.

**Schedule 2.1.1(f)**
**Accreditations and Governmental Authorizations**

**Mayville Die & Tool, Inc.**

None.

**Schedule 2.1.1(g)**
**Intangible Assets**

**Mayville Die & Tool, Inc.**

All existing rights to the name "Mayville Die & Tool, Inc.," and use of the name "Mayville" in connection with the Business.

**Schedule 2.1.1(k)**
**Real Property**

**Mayville Die & Tool, Inc.**

See attached.

2.1.1(k)

# EXHIBIT A

**PARCEL I:**

All that part of the South East 1/4 of Section 14, Township 12 North, Range 16 East, in the City of Mayville, Dodge County, Wisconsin, described as follows:

Commencing at the North East corner of the South East 1/4 of Section 14, Township 12 North, Range 16 East; thence South 89 degrees 59 minutes 13 seconds West along the North line of the said South East 1/4, 111.00 feet to the Westerly right-of-way line of North Main Street; thence South 13 degrees 36 minutes 00 seconds West along the said Westerly right-of-way line, 744.95 feet; thence North 55 degrees 43 minutes 00 seconds West, 23.80 feet; thence North 89 degrees 24 minutes 00 seconds West, 271.10 feet; thence North 73 degrees 30 minutes 30 seconds West, 173.30 feet to the place of beginning of this description; thence North 75 degrees 50 minutes 00 seconds West, 300.00 feet; thence North 14 degrees 10 minutes 00 seconds East, 511.68 feet; thence South 49 degrees 46 minutes 00 seconds West, 99.58 feet; thence South 29 degrees 07 minutes 00 seconds West, 151.85 feet; thence South 03 degrees 46 minutes 00 seconds East, 160.58 feet; thence South 00 degrees 45 minutes 00 seconds West, 580.66 feet; thence South 24 degrees 55 minutes 48.9 seconds West 559.19 feet; thence East, 30.00 feet; thence South 01 degrees 14 minutes 50 seconds West, 85.99 feet; thence South 83 degrees 50 minutes 00 seconds East 139.75 feet; thence South 04 degrees 53 minutes 00 seconds West, 222.76 feet; thence North 87 degrees 12 minutes 45 seconds East, 59.59 feet; thence North 15 degrees 22 minutes 00 seconds East, 279.212 feet; thence South 82 degrees 25 minutes 00 seconds East 7.51 feet; thence North 07 degrees 35 minutes 00 seconds East, 55.00 feet; thence South 78 degrees 55 minutes 00 seconds East, 17.80 feet; thence North 14 degrees 10 minutes 00 seconds East, 297.41 feet; thence North 82 degrees 14 minutes 00 seconds East, 14.00 feet; thence North 14 degrees 10 minutes 00 seconds East, 604.18 feet to the place of beginning.

Including all lands lying between the meander line and the West bank of Rock River.

**PARCEL II**

Lot 2 of Dodge County Certified Survey Map No. 4551 recorded in Dodge County Registry on June 17, 1999 in Volume 29 of Certified Survey Maps on pages 52-53 as Document No. 893080, being Lot 1 and Lot 2 of Certified Survey Map No. 1112, and a part of the South West 1/4 and the South East 1/4 all in the South East 1/4, Section 14, Township 12 North, Range 16 East, City of Mayville, Dodge County, Wisconsin.

**PARCEL III**

Easement for the benefit of Lots 1 and 2 of Certified Survey Map No. 4551, previously known as Lots 1 and 2 of Certified Survey Map No. 1112, as set forth in Quit Claim Deed recorded in Volume 527 of Records, on page 114, as Document No. 632918 for the non-exclusive ingress and egress over a parcel of land which is 15 feet in width and located immediately adjacent to the North side of said Lot 1 of Certified Survey Map No. 1112.

**Parcel Identification No. 251-1216-1441-002**

**Schedule 3.2**
**Purchase Price Allocation**

**Mayville Die & Tool, Inc.**

Buyer shall prepare an allocation of the Purchase Price (and all other capitalized costs) among the Purchased Assets in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended, and the Treasury regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate), which allocation shall be binding upon Seller. Buyer shall deliver such allocation to Seller within 60 days after the Closing Date. Buyer and Seller and their affiliates shall report, act and file tax returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation prepared by Buyer. Seller shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as Buyer may reasonably request to prepare such allocation. Neither Buyer nor Seller shall take any position (whether in audits, tax returns or otherwise) that is inconsistent with such allocation unless required to do so by applicable law.

## Schedule 5.2.2
## Consents or Notices to Governmental Authorities

### Mayville Die & Tool, Inc.

Consents and/or notices required by the Bankruptcy Code and the Bankruptcy Court with respect to the Bankruptcy Case and the Contemplated Transactions.

**Schedule 5.6**
**Security Interests**

**Mayville Die & Tool, Inc.**

See attached.

## UCC Filing Search

Displaying 11 selected items of the 11 search results for when active filings were searched for organizations that begin with "mayville" and contain "tool".

### General Information

| | |
|---|---|
| Filing Office | WEB |
| Filing Number | 090013634724 |
| Filing Type | INITIAL FINANCING |
| Status | Active |

Terminated filings appear as Active until they expire. See the Filing History below for any amendments to this filing.

| | |
|---|---|
| Effective Date-Time | 11/17/2009 4:41:23 PM |
| Expires | 11/17/2014 |

### Selected Debtor

MAYVILLE DIE & TOOL, INC.
PO BOX 113
MAYVILLE, WI 53050
USA

### Secured Party(s) of Record

HOMETOWN BANK
80 SHEBOYGAN STREET
FOND DU LAC, WI 54935
UNITED STATES

### Filing History

None: Original filing only

### General Information

| | |
|---|---|
| Filing Office | WEB |
| Filing Number | 090013633622 |
| Filing Type | INITIAL FINANCING |
| Status | Active |

Terminated filings appear as Active until they expire. See the Filing History below for any amendments to this filing.

| | |
|---|---|
| Effective Date-Time | 11/17/2009 4:19:53 PM |
| Expires | 11/17/2014 |

### Selected Debtor

MAYVILLE DIE & TOOL, INC.
PO BOX 113
MAYVILLE, WI 53050
USA

## Secured Party(s) of Record

**HOMETOWN BANK**
80 SHEBOYGAN STREET
FOND DU LAC, WI 54935
UNITED STATES

## Filing History

None: Original filing only

## General Information

| | |
|---|---|
| Filing Office | WEB |
| Filing Number | 090000924621 |
| Filing Type | INITIAL FINANCING |
| Status | Active |

> Terminated filings appear as Active until they expire. See the Filing History below for any amendments to this filing.

| | |
|---|---|
| Effective Date-Time | 1/22/2009 10:11:48 AM |
| Expires | 1/22/2014 |

## Selected Debtor

**MAYVILLE DIE & TOOL INC**
700 N FURNACE STREET
MAYVILLE, WI 53050
USA

## Secured Party(s) of Record

**GFC LEASING**
2675 RESEARCH PARK DR
MADISON, WI 53711-2290
UNITED STATES

## Filing History

None: Original filing only

## General Information

| | |
|---|---|
| Filing Office | WEB |
| Filing Number | 090000741012 |
| Filing Type | INITIAL FINANCING |
| Status | Active |

> Terminated filings appear as Active until they expire. See the Filing History below for any amendments to this filing.

| | |
|---|---|
| Effective Date-Time | 1/16/2009 3:22:20 PM |

**Expires**          1/16/2014

## Selected Debtor

MAYVILLE DIE & TOOL, INC.
PO BOX 113
MAYVILLE, WI 53050-0113
USA

## Secured Party(s) of Record

HOMETOWN BANK
80 SHEBOYGAN STREET
FOND DU LAC, WI 54935
UNITED STATES

## Filing History

None: Original filing only

---

## General Information

| | |
|---|---|
| **Filing Office** | DFI |
| **Filing Number** | 050000122005 |
| **Filing Type** | INITIAL FINANCING |
| **Status** | Active |

Terminated filings appear as Active until they expire. See the **Filing History** below for any amendments to this filing.

| | |
|---|---|
| **Effective Date-Time** | 1/3/2005 10:10:00 AM |
| **Expires** | 1/3/2015 |

## Selected Debtor

MAYVILLE DIE & TOOL, INC.
700 N. FURNACE STREET
MAYVILLE, WI 53050
US

## Secured Party(s) of Record

CITIBANK, N.A.
388 GREENWICH STREET
NEW YORK, NY 10013
US

## Filing History

| Filing Office | Filing Number | Filing Type | Effective Date-Time | Expires |
|---|---|---|---|---|
| WEB | 090011363822 | CONTINUATION | 9/22/2009 3:15:26 PM | -NA- |

---

## General Information

| | |
|---|---|
| **Filing Office** | WEB |
| **Filing Number** | 030018222015 |
| **Filing Type** | INITIAL FINANCING |
| **Status** | Active |

Terminated filings appear as **Active** until they expire. See the **Filing History** below for any amendments to this filing.

| | |
|---|---|
| **Effective Date-Time** | 11/4/2003 3:28:34 PM |
| **Expires** | 11/4/2013 |

## Selected Debtor

MAYVILLE DIE & TOOL, INC.
700 FURNACE ST
MAYVILLE, WI 53050
USA

## Secured Party(s) of Record

HOMETOWN BANK
1200 MAIN ST
PO BOX 107
ST CLOUD, WI 53079
UNITED STATES

## Filing History

| Filing Office | Filing Number | Filing Type | Effective Date-Time | Expires |
|---|---|---|---|---|
| WEB | 080007563829 | CONTINUATION | 5/28/2008 11:24:52 AM | -NA- |

## General Information

| | |
|---|---|
| **Filing Office** | WEB |
| **Filing Number** | 030008403116 |
| **Filing Type** | INITIAL FINANCING |
| **Status** | Active |

Terminated filings appear as **Active** until they expire. See the **Filing History** below for any amendments to this filing.

| | |
|---|---|
| **Effective Date-Time** | 5/20/2003 9:47:35 AM |
| **Expires** | 5/20/2013 |

## Selected Debtor

MAYVILLE DIE & TOOL, INC.
700 N FURNACE ST
MAYVILLE, WI 53050
USA

## Secured Party(s) of Record

HOMETOWN BANK
1200 MAIN ST
PO BOX 107

ST CLOUD, WI 53079
UNITED STATES

## Filing History

| Filing Office | Filing Number | Filing Type | Effective Date-Time | Expires |
|---|---|---|---|---|
| WEB | 070017541826 | CONTINUATION | 12/26/2007 1:50:54 PM | -NA- |

## General Information

| | |
|---|---|
| Filing Office | WEB |
| Filing Number | 030007506018 |
| Filing Type | INITIAL FINANCING |
| Status | Active |

Terminated filings appear as Active until they expire. See the Filing
History below for any amendments to this filing.

| | |
|---|---|
| Effective Date-Time | 5/6/2003 4:59:56 PM |
| Expires | 5/6/2013 |

## Selected Debtor

Mayville Die & Tool, Inc.
700 Furnace Street
Mayville, WI 53050
USA

## Secured Party(s) of Record

Hometown Bank
88 South Portland Street, Suite 203
Fond Du Lac, WI 54935
UNITED STATES

## Filing History

| Filing Office | Filing Number | Filing Type | Effective Date-Time | Expires |
|---|---|---|---|---|
| WEB | 070017552424 | CONTINUATION | 12/26/2007 2:41:40 PM | -NA- |

## General Information

| | |
|---|---|
| Filing Office | WEB |
| Filing Number | 020012564422 |
| Filing Type | INITIAL FINANCING |
| Status | Active |

Terminated filings appear as Active until they expire. See the Filing
History below for any amendments to this filing.

| | |
|---|---|
| Effective Date-Time | 7/1/2002 4:24:21 PM |
| Expires | 7/1/2012 |

## Selected Debtor

MAYVILLE DIE & TOOL, INC.
700 N FURNACE STREET
MAYVILLE, WI 53050
USA

## Secured Party(s) of Record

HOMETOWN BANK
1200 MAIN
P.O. BOX 107
ST. CLOUD, WI 53079
UNITED STATES

## Filing History

| Filing Office | Filing Number | Filing Type | Effective Date-Time | Expires |
|---|---|---|---|---|
| WEB | 070001968125 | CONTINUATION | 2/8/2007 4:34:32 PM | -NA- |

## General Information

| | |
|---|---|
| Filing Office | WEB |
| Filing Number | 020012562824 |
| Filing Type | INITIAL FINANCING |
| Status | Active |

Terminated filings appear as Active until they expire. See the Filing History below for any amendments to this filing.

| | |
|---|---|
| Effective Date-Time | 7/1/2002 4:16:32 PM |
| Expires | 7/1/2012 |

## Selected Debtor

MAYVILLE DIE & TOOL, INC.
700 N FURNACE STREET
MAYVILLE, WI 53050
USA

## Secured Party(s) of Record

HOMETOWN BANK
1200 MAIN
P.O. BOX 107
ST CLOUD, WI 53079
UNITED STATES

## Filing History

| Filing Office | Filing Number | Filing Type | Effective Date-Time | Expires |
|---|---|---|---|---|
| WEB | 070001976225 | CONTINUATION | 2/9/2007 8:55:36 AM | -NA- |

## General Information

| | |
|---|---|
| **Filing Office** | WEB |
| **Filing Number** | 020012560519 |
| **Filing Type** | INITIAL FINANCING |
| **Status** | Active |

> Terminated filings appear as Active until they expire. See the Filing
> History below for any amendments to this filing.

| | |
|---|---|
| **Effective Date-Time** | 7/1/2002 4:05:15 PM |
| **Expires** | 7/1/2012 |

## Selected Debtor

MAYVILLE DIE & TOOL, INC.
700 N FURNACE STREET
MAYVILLE, WI 53050
USA

## Secured Party(s) of Record

HOMETOWN BANK
1200 MAIN
P.O. BOX 107
ST. CLOUD, WI 53079
UNITED STATES

## Filing History

| Filing Office | Filing Number | Filing Type | Effective Date-Time | Expires |
|---|---|---|---|---|
| WEB | 070001968024 | CONTINUATION | 2/8/2007 4:34:29 PM | -NA- |

Results from this search reflect filings through 8/12/2011, except for UCC InstantFile filings which are effective upon submission.

**Schedule 5.9**
**Undisclosed Liabilities**

**Mayville Die & Tool, Inc.**

None.

**Schedule 5.11**
**Material Adverse Change**

**Mayville Die & Tool, Inc.**

None.

**Schedule 5.15**
**Contracts**

**Mayville Die & Tool, Inc.**

In addition to the list of contracts attached hereto:

Fidelity Investments Retirement Service Plan Agreement dated September 9, 2008 by and between Fidelity Management Trust Company and Mayville Die & Tool Inc.

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
|---|---|
| RMI Worldwide, LLC<br>1882 N. 106th E. Ave.<br>Tulsa, OK 74116 | Purchase Order No. 884 dated May 23, 2011, No. 888 dated June 2, 2011. |
| Schlosser Forge Company<br>11711 Arrow Route<br>Rancho Cucamonga, CA 91730 | Purchase Order No. 176187 dated August 1, 2011. |
| Sescoi US, Inc.<br>2000 Town Center, Suite 1730<br>Southfield, MI 48075 | WorkNC FL/1 Software Maintenance AGreement dated November 17, 2010 |
| TechniGraphicS<br>2000 Noble Dr.<br>Wooster, OH 44691 | V5 Hybrid Design and STEP Core Interface maintenance agreement dated August 31, 2010. |
| Tool Service Corporation<br>2942 N. 117th Street<br>Milwaukee, WI 53222-4106 | Inventory Management Agreement dated July 5, 2006. |
| Weber Metals, Inc.<br>PO Box 318<br>Paramount, CA 90723 | Purchase Order 038223 dated May 9, 2011, No. 040486 dated August 10, 2011. |
| Wyman Gordon<br>244 Worchester St.<br>North Grafton, MA 01536 | Purchase Order No. 204258 dated June 14, 2011, No. 204774 dated July 15, 2011, |

Sheet __1__ of __1__ continuation sheets attached to the Schedule of Executory Contracts and Unexpired Leases

Software Copyright (c) 1996-2011 - CCH INCORPORATED - www.bestcase.com

Best Case Bankruptcy

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
|---|---|
| A. Finkl & Sons Company 2011 Southport Avenue Chicago, IL 60614-4079 | Purchase Order No. 147116 dated July 19, 2011, No. 147515 dated Jly 27, 2011, No. 147593 dated July 28, 2011, No. 147665 dated July 29, 2011, No. 147724 dated August 1, 2011, No. 147796 dated August 2, 2011, No. 147789 dated August 2, 2011, No. 147849 dated August 3, 2011, No. 147930 dated August 4, 2011, No. 148098 dated August 9, 2011. |
| Alcoa Wheel & Forged Products 1600 Harvard Avenue Cleveland, OH 44105 | Purchase Order Number 2184952ECM dated June 3, 2011 |
| Cintas Corporation #446 2222 Vondron Road Madison, WI 53718-6732 | Facility Services Rental Service Agreement dated February 8, 2011. |
| Citibank NA 388 Greenwich Street New York, NY 10013 | Supplier Agreement regarding Alco, Inc. |
| District Lodge 10 1650 S. 38th St. Milwaukee, WI 53215-1726 | Debtor is a party to a union contract with District Lodge 10 of the International Association of Machinists and Aerospace Workers, Local Lodge DS 2053, effective until October 31, 2013. |
| FoxDen Landscaping & Nursery PO Box 243 Mayville, WI 53050 | Agreement for law mowing for the 2011 season |
| GFC Leasing PO Box 2290 Madison, WI 53701 | DFH00105/S9472 Image RUNNER 3225 Lease dated January 15, 2009 |
| Ladish Forging PO Box 8902 Cudahy, WI 53110-8902 | Purchase Order No. P096735 dated July 15, 2011, No. P096737 dated July 15, 2011, No. P097223 dated August 2, 2011. |
| Pitney BowesGlobal Financial Serv. LLC P.O. Box 371887 Pittsburgh, PA 15250-7887 | Lease for mailing equipment. Lease Scheduel # 8601347-001 RT6 dated June 13, 2011. |
| Programming Plus, INc. 17685 West Lincoln Ave. New Berlin, WI 53146-2120 | SURFCAM and TrueMILL Software Maintenance Agreement dated September 3, 2010 |

1

_____ continuation sheets attached to Schedule of Executory Contracts and Unexpired Leases

Software Copyright (c) 1996-2011 - CCH INCORPORATED - www.bestcase.com

Best Case Bankruptcy

**Schedule 5.17.1**
**Employees**

**Mayville Die & Tool, Inc.**

See attached.

| | SCHEDULE 5.17.1 | | | |
|---|---|---|---|---|
| | | | Date of | BASE |
| | **EMPLOYEES:** | **TITLE** | Hire | WAGE |
| 1 | JOHN D. BAUMHARDT | Die Sinker | 06-29-98 | $20.42 |
| 2 | BARRY L. BEHNKE | Die Sinker | 06-22-95 | $20.42 |
| 3 | STEVEN R. BONACK | Bencher | 04-08-96 | $20.42 |
| 4 | JERRY J. CLARK, JR. | Die Sinker | 08-07-95 | $20.42 |
| 5 | FRANCIS E. EILBES | Machinist | 01-11-88 | $18.06 |
| 6 | CHAD A. GEIGER | Programmer | 10-29-92 | $23.09 |
| 7 | JAMES G. HECHIMOVICH | Maintenance | 03-06-95 | $20.42 |
| 8 | GLEN HELMBRECHT | President | 05-13-09 | $67,500/yr |
| 9 | THOMAS E. HELMBRECH | Machinist | 10-28-74 | $18.06 |
| 10 | GREGORY KRAPFL | Plant Manager | 09-10-84 | $66,959/yr |
| 11 | GARY METKE | Inside Sales Manager | 01-21-74 | $58,500/yr |
| 12 | ANN RAYOME | Office Manager | 01-01-09 | $18.78 |
| 13 | JOHN C. REGNER | Die Sinker | 11-03-88 | $20.42 |
| 14 | LARRY M. RETZLAFF | Janitor | 01-28-02 | $14.69 |
| 15 | DAVID P. RUBEL | Die Sinker | 08-24-98 | $20.42 |
| 16 | MICHAEL S. RUBEL | Die Sinker | 03-15-99 | $20.42 |
| 17 | GREGG H. SCHAMPERS | Machinist | 08-25-97 | $18.06 |
| 18 | JOHN C. SCHRAUFNAGEL | Die Sinker | 06-01-78 | $20.42 |
| 19 | GREGORY A. SCOTT | Quality Control | 06-26-95 | $20.60 |
| 20 | MICHAEL WANTZ | Bencher | 08-09-10 | $16.51 |
| 21 | JOSEPH J. WIEMER | Bencher | 07-17-06 | $20.42 |
| 22 | MICHAEL WIEMER | Die Sinker | 05-24-10 | $18.44 |

**Schedule 5.17.2**
**Non-Competition and Related Party Agreements**

**Mayville Die & Tool, Inc.**

None.

**Schedule 5.17.5**
**Employee Licenses**

**Mayville Die & Tool, Inc.**

State of Wisconsin Drivers' Licenses.

**Schedule 5.22**
**Environmental Matters**

**Mayville Die & Tool, Inc.**

None.

**EXHIBIT B**

## MAYVILLE DIE & TOOL, INC.
### BIDDING PROCEDURES

**A.** **INTRODUCTION AND BACKGROUND**

Mayville Die & Tool, Inc. ("Mayville" or "Debtor") is the debtor and debtor-in-possession in Case No. 11-_____, pending in the United States Bankruptcy Court for the Eastern District of Wisconsin ("Bankruptcy Court").

The Bankruptcy Court has authorized the Debtor to enter into an agreement for the sale of assets of Debtor to Mayville Asset Acquisition, LLC (the "Stalking Horse") pursuant to that certain Asset Purchase Agreement ("Asset Purchase Agreement" or "APA") between Mayville, named therein as Seller, and the Stalking Horse (the "Stalking Horse Bid"), but subject to and in accordance with the process described in the procedures set forth below ("Bidding Procedures").

The Auction will be managed by Debtor's counsel of record, Murphy Desmond S.C. ("Murphy Desmond"). Information about the assets is prepared by Debtor and is available to parties who sign confidentiality agreements and are approved by Debtor as Qualified Bidders, as described below.

**B.** **KEY DATES**

The key dates for this process are as follows:

- _____, 2011- APA and Sale Procedures Hearing
- _____, 2011- Due dates for bids
- _____, 2011- Auction
- _____, 2011- Sale approval hearing
- _____, 2011- Closing

**C.** **STALKING HORSE BID**

On or about August 19, 2011, the Debtor entered into the APA with the Stalking Horse. A copy of the APA is available through Murphy Desmond or on the Bankruptcy Court's website as an attachment to the Notice of Motion and Motion for Orders: (1) Authorizing Debtor to sell assets free and clear of liens, claims, interests and encumbrances pursuant to APA; (2) Approving bidding procedures and auction; (3) Approving breakup fee; (4) Authorizing Debtor to disburse sale proceeds; (5) Approving Notice; and (6) Scheduling Further Hearing ("Sale Motion"). Depending on the circumstances as set forth in the APA, the Stalking Horse may be paid a breakup fee of $100,000, which includes any right to expense reimbursement. The assets to be acquired are described in the APA (the "Assets"). Other

interested bidders will have opportunities to bid on the Assets at the Auction, as described in the APA.

## D.     THE ADJUSTED PURCHASE PRICE

The Base Purchase Price, pursuant to the APA, is $2.3 million. The purchase price shall be decreased dollar-for –dollar in an amount equal to the aggregate of (i) the amount of accrued liability on Seller's balance sheet as of the Closing Date[1] for Finished Products related to any pre-paid work purchase orders of the Stalking Horse or any of its affiliates, including A. Finkl & Sons, Co.; (ii) the aggregate balance, at Closing, of any discretionary loans made by the Stalking Horse or any of its affiliates pursuant to specific requests by Debtor pursuant to the APA; and (iii) the Remediation Amount. The Base Purchase Price less these adjustments is the "Adjusted Purchase Price." Although ultimately determined at Closing, the Adjusted Purchase Price will be calculated every afternoon. The Debtor or Murphy Desmond will inform interested parties of the most recently requested Adjusted Purchase Price, upon request.

## E.     QUALIFIED BIDDER

To participate in the sale process, conduct due diligence and be entitled to submit a bid, a party must deliver to Murphy Desmond:

1.      A signed confidentiality agreement reasonably satisfactory to the Debtor;

2.      Evidence satisfactory to the Debtor, after consultation with Murphy Desmond, demonstrating that the bidder has the financial ability to close the sale at materially the price proposed and to consummate a transaction ("Financial Ability").

A party who submits those documents is a Qualified Bidder.

## F.     DUE DILIGENCE

Qualified Bidders will be offered the opportunity to conduct reasonable due diligence as long as the sale process is ongoing and until the Bid Deadline.

## G.     BID DEADLINE

The deadline for Qualified Bids (as defined below) is three business days prior to the commencement of  Auction ( _____, 2011), at 10:00 a.m. CST (the "Bid Deadline"). The Qualified Bid must be in writing submitted to:

Rebecca R. DeMarb
Murphy Desmond S.C.

---

[1] Unless specifically defined herein, all capitalized terms are given the definitions used in the APA.

33 East Main Street, Suite 500
P.O. Box 2038
Madison, Wisconsin 53701-2038
Phone: (608) 268-5618
Fax: (608) 257-4333
rdemarb@murphydesmond.com

## H.    QUALIFIED BID

To be eligible to participate in the Auction, a Qualified Bidder must:

1.    No later than the Bid Deadline, submit to Murphy Desmond a package (the "Bid Package") that includes all of the following items:

a.    A written acknowledgement that it agrees to all of the terms set forth in these Bidding Procedures and agrees that the bid contained in the Bid Package constitutes an irrevocable offer and is binding on the Qualified Bidder until the earlier to occur of 48 hours after the sale of the assets has closed or thirty (30) days after the Sale Approval Hearing;

b.    Written evidence it has obtained authorization and approval from its Board of Directors (or comparable governing body), if necessary, with respect to the submission of its bid and acceptance of the terms of sale set forth in these Bidding Procedures, or representations that no such authorization or approval is required;

c.    A written statement identifying the person or persons entitled to bid at Auction for the Qualified Bidder;

d.    Financial statements and/or written evidence of a financing commitment or other evidence, satisfactory to Debtor (after consultation with Murphy Desmond) of the financial ability to close under its Asset Purchase Agreement within the deadline described above (provided, however, that the closing of the sale shall not be contingent in any way on the Qualified Bidder procuring financing);

e.    A signed asset purchase agreement in the form of the APA signed by the Stalking Horse Bidder "redlined" to show any modifications required by the Bidder (the "Competing Bid"). The Competing Bid:

1.    Shall be without contingency for financing or further due diligence and shall not contain a break-up fee or expense reimbursement;

2.    Must be acceptable to the Debtor and Murphy Desmond. The Debtor will use its sole discretion and reasonable judgment in valuing

contractual modification or excluding assets contemplated in any Competing Bid; and

3.    Must be at least in the amount of the Adjusted Purchase Price plus an initial overbid of 15% of the Adjusted Purchase Price. After the initial overbid, bids must be in increments of at least $100,000.

f.    A deposit ("Deposit"), in an amount equal to ten percent (10%) of the amount of the Competing Bid, in the form of a cashier's check payable to the order of Murphy Desmond S.C. Trust Account, counsel for Debtor, or a wire transfer or ACH to the Murphy Desmond S.C. Trust Account, which will be returnable to the Qualified Bidder, as set forth in Paragraph K;

g.    A disclosure of the identity of each entity or person submitting the Competing Bid or otherwise participating in the Competing Bid, and the complete terms of any such participation.

2.    The Debtor, in consultation with Murphy Desmond, will analyze each Competing Bid based on the criteria detailed above to determine which bids will be treated as "Qualified Bids" based on the capability to close a transaction, the bid's impact on all constituents of Debtor, and the amount of the bid. Murphy Desmond and/or the Debtor may, at any time, contact bidders to discuss or clarify terms, to indicate any terms which may need to be modified in order to conform the bid to a Qualified Bid, or to negotiate terms.

3.    For the purposes of the Auction, the APA submitted by the Stalking Horse is a Qualified Bid and the Stalking Horse is a Qualified Bidder for all purposes and requirements, pursuant to the Bidding Procedures, notwithstanding the requirements that bidders must satisfy to be a Qualified Bidder. The Stalking Horse shall not be required to take any further action to participate in the Auction, or if the Stalking Horse Bid is the Prevailing Bid (as defined below) to be named the Prevailing Bidder (as defined below).

4.    The Debtor, in the exercise of its reasonable business judgment, reserves the right to reject any Competing Bid if such bid:

a.    Is on terms that are more burdensome or conditional than the terms of the APA;

b.    Is not received by the Bid Deadline;

c.    Is subject to any due diligence, financing contingency or other contingencies (including representations, warranties, covenants and timing requirements) or an estimated time to close which materially affects the value of the bid; or

d.    Provides less economic benefit to the estate and its creditors.

Any bid rejected pursuant to this Paragraph shall not be deemed to be a Qualified Bid.

## I.    AUCTION

1.    Qualified Bidders who are deemed to have submitted a Qualified Bid will convene on _____ at 10:00 a.m. CST at the office of Murphy Desmond S.C., 33 East Main Street, Suite 500, Madison, Wisconsin 53703, or at such other location selected by Murphy Desmond with written notice to each party that has submitted a Qualified Bid, for the Auction (the "Auction"). If no Qualified Bid is received other than the Stalking Horse Bid, no Auction will take place, and the Stalking Horse Bid will be deemed the Prevailing Bid. The Auction may be postponed by announcement by Murphy Desmond, but not for more than ten (10) business days. The Auction may be conducted by telephone, at the discretion of Murphy Desmond.

2.    Murphy Desmond may establish and announce rules on the conduct of the Auction and may modify those rules in its discretion; provided that such rules are in all material respects consistent with these Bidding Procedures and are designed to promote the most competitive bidding process.

3.    Bidding shall begin with Murphy Desmond's announcement of the Qualified Bidders and of the bid determined to be the initial best and highest bid(s), after consultation with the Bank and the Official Committee of Unsecured Creditors, if one has been appointed or, in the alternative, the Office of the United States Trustee ("Committee"). The Auction shall proceed with the Stalking Horse Bid and all other Qualified Bidders offered the opportunity to increase their bids as to assets that are in all material respects the same in an initial increment of at least the Adjusted Purchase Price plus 15% of the Adjusted Purchase Price, and thereafter subsequent increments of at least $100,000.00. The Stalking Horse will be permitted to credit bid its Break-Up Fee as part of any subsequent bidding. The amount of such bids will be made known to all other Qualified Bidders.

4.    When such bidding has ceased, the bid or bids that are deemed by Murphy Desmond, on behalf of Debtor, the highest and best bid(s) will be announced at the close of bidding.

5.    The highest and best bid(s) is referred to herein as the "Prevailing Bid(s)" and the maker(s) of such bid(s) is referred to as the "Prevailing Bidder(s)." The next highest and best bid will be the "Back-Up Bid(s)" and the maker of the bid(s) will be the "Back-Up Bidder(s)," except that the Stalking Horse is not required to be a Back-Up Bidder if it is not the Prevailing Bidder.

6.    If the Stalking Horse does not close on the purchase of the Assets because it is not the Prevailing Bidder or does not choose to be the Back-Up Bidder, the Break-Up Fee shall be paid at Closing on the sale to the Prevailing Bidder and the Stalking Horse shall be entitled to the return of its deposit as described in the APA. If the Stalking Horse is the Prevailing Bidder (or chooses to be the Back-Up Bidder and the Prevailing Bidder fails to close), no Break-Up Fee shall be paid provided, however, if the Stalking Horse credit bids its Break-Up

Fee as part of its bid in the Auction, then such Break-Up Fee shall be credited against the ultimate gross purchase price of such Prevailing Bid.

7.     No additional bids will be considered after the end of the Auction.

8.     In determining which bid constitutes the "Prevailing Bid" or the "Prevailing Bids" and the "Back-Up Bid" or "Back-Up Bids," the Debtor, in consultation with Murphy Desmond, will use its reasonable business judgment and may consider, among other things (i) the purchase price offered in the Qualifying Bid; (ii) Qualified Bidder's financial situation and wherewithal; (iii) the probability of prompt closing; (iv) ability to demonstrate adequate assurance of future performance of all contracts to be assumed; and (v) the best interest of holders of claims and interests.

9.     **LIMITED ONLY TO THE EXTENT THAT THE STALKING HORSE, ONLY, IS NOT REQUIRED TO BE A BACK-UP BIDDER, EACH BID SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE PREVAILING BIDDER(S) AND THE BACK-UP BIDDER(S) FROM THE TIME THE BID IS SUBMITTED UNTIL THE EARLIER TO OCCUR OF 48 HOURS AFTER THE SALE OF THE ASSETS HAS CLOSED OR THIRTY (30) DAYS AFTER THE APPROVAL HEARING.**

10.     All Qualified Bidders at the Auction will be deemed to have consented to the core jurisdiction of the Bankruptcy Court with respect to the Debtor and the Assets and waived any right to jury trial in connection with any dispute relating to the Auction, the sale of the Assets and the construction and enforcement of the APA.

## J.     SALE OF APPROVAL HEARING

If an Auction takes place, on _____, 2011 at _____ a.m. CST, the Bankruptcy Court will hold a hearing ("Sale Approval Hearing") at which the Debtor will seek Bankruptcy Court approval of the Prevailing Bid(s) and of the Back-Up Bid(s). In the event that a Prevailing Bidder(s) cannot or refuses to consummate the sale because of the breach or failure on the part of the Prevailing Bidder(s), Debtor will be permitted to close with the Back-Up Bidder(s) on the terms of the Back-Up Bid(s) without further order of the Bankruptcy Court. Debtor's presentation to the Bankruptcy Court for approval of those particular bids shall not constitute acceptance of any bids. Debtor has accepted a bid only when the Bankruptcy Court, following the Sale Approval Hearing, has approved the sale. No additional bids will be considered after the end of the Auction.

## K.     CLOSING

Closing(s) (the "Closing") shall occur on or before the tenth (10th) business day after the entry of the order approving the sale, all consistent with the APA, subject to the right of the Debtor and the Prevailing Bidder or the Back-Up Bidder as the case may be, to extend such date as consistent with the applicable APA provisions.

Each deposit submitted pursuant to these Bidding Procedures will be held in escrow until:

1.  As to other bidders, the selection of the Prevailing Bidder(s) and the Back-Up Bidder(s); or

2.  As to the Back-Up Bidder(s), the earlier to occur of 48 hours after Closing of the sale of the assets to the Prevailing Bidder(s) or thirty (30) days after the Sale Approval Hearing. The deposits received from the Prevailing Bidder(s) or the Back-Up Bidder(s) as the case may be shall be held and shall constitute liquidated damages in the event that the Bankruptcy Court approves the Asset Purchase Agreement to which the Prevailing Bidder(s) or Back-Up Bidder(s), as applies, is a party, but the sale is not consummated, through no fault of the Debtor.

## L.  GENERAL

These Bidding Procedures are subject to modification from time to time by the Debtor (after consultation with Murphy Desmond) as circumstances may warrant. Debtor shall promptly notify parties in interest and prospective bidders of any such modifications. Except as provided in the APA, no bidder has any rights against Debtor, its estate, and/or any of the Debtor's other professionals by virtue of any modification of these Bidding Procedures, or by virtue of having or not having its bid accepted by Debtor or approved by the Bankruptcy Court.

## M.  TERMS OF SALE

Sale of the assets shall be on an "As Is, Where Is" basis and without representation or warranties of any kind, nature or description by Debtor or its agents, except as provided in the APA. All of the Debtor's right, title and interest in and to the Assets shall be sold free and clear of all liens and encumbrances, claims and interests to the full extent available pursuant to 11 U.S.C. § 363, without limitation, the interest of any secured creditor, unsecured creditor, equity interest holder or any other person holding an interest in said assets with such interest to attach to the net proceeds of the Sale.

## N.  RESERVATION OF RIGHTS

Debtor, in consultation with Murphy Desmond, may: (a) at any time prior to the end of the Auction determine in its business judgment and based on the criteria outlined herein, which bids are the highest and best bids for the assets and in the best interest of Debtor's estate; and (b) reject at any time before entry of an order by the Bankruptcy Court approving a Prevailing Bid (or Back-Up Bid) any bid (other than the Stalking Horse Bid) that, in the Debtor's discretion is: (i) inadequate or insufficient based on the criteria outlined herein, (ii) not in conformity with these procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interest of the Debtor and the Debtor's estate; and (c) subject to the provisions of

Paragraph K, modify these procedures as set forth herein as required to best accomplish the sale of the Assets of the Debtor.

4827-6946-3050, v. 1

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WISCONSIN

In Re:

**MAYVILLE DIE & TOOL, INC.,**                    Case No. _____

        Debtor.

---

## NOTICE OF SALE AND BIDDING PROCEDURES

---

TO:    The United States Trustee, All Known Creditors, All Shareholders
       and Other Parties-in-Interest

     **NOTICE:** The Debtor filed the Motion for Orders (1) Authorizing Debtor to Sell Substantially All Assets Free and Clear of Liens, Claims, Interests and Encumbrances Pursuant to the APA; (3) Approving Bidding Procedures and Auction; (4) Approving Break-Up Fee; (4) Authorizing Debtor to Disburse Sale Proceeds; (5) Approving Notice; and (6) Scheduling Further Hearing (the "Sale Motion") on _____, 2011. On ___, **2011 at ___ a.m.** in Courtroom ___, United States Bankruptcy Court, 517 East Wisconsin Avenue, Milwaukee, Wisconsin, the above-captioned Debtor will ask the Court to approve a sale of substantially all of the Debtor's assets (the "Assets") free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens"), with all such Liens to attach to the sale proceeds (the "Sale Approval Hearing"). The Sale Approval Hearing may be continued from time to time without further notice, except by the announcement in open court of the time and place of such continued Sale Hearing.

     The Assets will be sold pursuant to Bidding Procedures substantially similar to those approved by the Court on _____, 2011.

     The proposed Bidding Procedures set the following deadlines:

-   ___ @ ___ a.m.         APA and Sale Procedures Hearing
-   ___ @ ___ a.m.         Due Dates for Bids
-   ___ @ ___ a.m.         Auction

Jane F. (Ginger) Zimmerman
State Bar No. 1012103
jzimmerman@murphydesmond.com
Rebecca R. DeMarb
State Bar No 1026221
rdemarb@murphydesmond.com
Murphy Desmond S.C.
33 East Main Street, 5th Floor
P.O. Box 2038
Madison, WI 53701-2038
Phone: (608) 257-7181
Fax: (608) 257-4333

26010.118056-2rrd-19081.sim
Case 11-33128-jes     Doc 7     Filed 08/25/11     Page 94 of 112
notice of sale and bidding procedures

**EXHIBIT C**

- ___ @ ___ a.m.          Sale Approval Hearing
- ___                     Closing

You are encouraged to review the Sale Motion, APA, the Bidding Procedures and other related papers, which are available on request from Debtor's counsel.

**Objections to the relief to be requested must be served on the parties below and must also be served and filed within three days before the Sale Approval Hearing.**

**Debtor:**                          **United States Trustee:**
Rebecca R. DeMarb                David Asbach, Assistant U.S. Trustee
Murphy Desmond S.C.              Office of The United States Trustee
33 East Main Street, Suite 500   517 East Wisconsin Avenue Suite 430
Madison, WI  53703               Milwaukee, WI  53202
(608) 257-7181                   Phone: (414) 297-4499
Fax: (608) 257-4333              Facsimile: (414) 297-4478

**Any objector must also appear at the hearing.**

**Copies of the Debtor's Sale Motion, the Asset Purchase Agreement and the Bidding Procedures are available from Debtor's counsel on request.**  Additional information may also be obtained on request from the Debtor's counsel.

Dated this ___ day of August, 2011.

**MURPHY DESMOND S.C.**
Attorneys for Debtor

By: _____
    Jane F. (Ginger) Zimmerman
    State Bar Number:  1012103
    Rebecca R. DeMarb
    State Bar Number:  1026221
    33 East Main Street, Suite 500
    P.O. Box 2038
    Madison, WI  53701-2038
    (608) 257-7181

4820-3211-7514, v.  1

**UNITED STATES BANKRUPTCY COURT    EASTERN DISTRICT OF WISCONSIN**

In the Matter of:

**MAYVILLE DIE & TOOL, INC.,**

Debtor.

In Bankruptcy No.

11-33128

## DECLARATION OF COUNSEL PURSUANT TO LOCAL RULE 6004(a)

Jane F. ("Ginger") Zimmerman, pre-petition counsel and proposed attorneys for Mayville Die & Took, Inc., hereby enters this Declaration of Counsel Pursuant to Local Rule 6004(a) ("Declaration").

1.     I am an attorney licensed to practice law in the State of Wisconsin and I am making this Declaration based upon my personal knowledge, except where specifically indicated.

2.     Mayville Die & Tool, Inc. ("Mayville" or "Debtor") retained me to represent it with regard to a possible sale of its assets in January of 2011. Starting in July of 2011, I became more heavily involved in advising Mayville regarding the Chapter 11 process and the Asset Purchase Agreement ("APA") with Mayville Asset Acquisition Company (the "Stalking Horse").

3.     Mayville filed its petition for relief pursuant to Chapter 11 of the Bankruptcy Code on the date of this Declaration (the "Petition Date").

Jane F. (Ginger) Zimmerman
jzimmerman@murphydesmond.com
Rebecca R. DeMarb
rdemarb@murphydesmond.com
Erin A. West
ewest@murphydesmond.com
Murphy Desmond S.C.
33 East Main Street Suite 500
P.O. Box 2038
Madison, WI 53701-2038
(608) 257-7181
(608) 257-4333 facsimile

**EXHIBIT D**

4.     **Communications with Secured Creditor**.  Before the Petition Date, I had periodic communications with the attorney for Hometown Bank, Alexander Ullenberg, regarding the terms of the APA and the bankruptcy filing.  Some of those communications may have been by email but most of such email communications would have been limited to scheduling telephone conferences and would not have been substantive in nature.  I have not communicated with any of the other creditors of the Debtor.

5.     **Communications with Debtor and Shareholders**.  Before the Petition Date, I had regular communication with Glen Helmbrecht, President of the Debtor. Some of these communications were by email and all such communications are subject to the attorney-client privilege.  During some of my telephone conversations with Glen Helmbrecht, he requested Gary Metke, Mayville's inside sales manager, to participate in our discussions.  I had one short meeting with all of the employees, who are participants in the ESOP, to discuss the salient terms of the APA and answer any questions about the APA and its conditions precedent.

6.     **Sale Contingencies**.  The sale contingencies are listed in Sections 4.2.1 and 4.3 of the APA.  The APA is contingent upon the results of a phase two environmental study (the "Phase II")  being satisfactory to the Stalking Horse and bankruptcy court approval of the sale pursuant to 11 U.S.C. § 363 as well as under Section 7.5 of the APA.  A copy of the APA is attached as Exhibit A to the Motion for Orders: (1) Authorizing Debtor to Sell Substantially All Assets Free and Clear of Liens, Claims, Interests and Encumbrances Pursuant to the APA; (2) Approving Bidding Procedures and Auction; (3) Approving Break-Up Fee; (4) Authorizing Debtor to Disburse Sale Proceeds; (5) Approving Notice; and (6) Scheduling Further Hearing (the "Sale Motion").

7.     **Credit Contact List**.  To the best of my information and belief, the list of the Debtor's 20-largest unsecured creditors, together with their contact persons, fax and telephone numbers, has been filed with the Court.

8. **Administrative Debts**. Assuming the Sale Motion is approved at the APA base price of $2.3 million, an estimate of administrative debts to be incurred prior to closing and the source of payment for such debts is as follows: The obligations of Mayville to be paid prior to closing include its regular operating expenses, payment of attorneys' fees and costs and other obligations necessary to the Chapter 11 filing. The Debtor estimates that the administrative expenses of the Chapter 11 case will be $100,000.00 through closing on the Sale. On the Petition Date, Murphy Desmond had $25,569.28 on deposit in its Trust Account. The Stalking Horse will make payments on its existing account payable to the Debtor and, if necessary, will accelerate the payment of payables invoiced but not yet due under its terms with the Debtor. The Stalking Horse may make advances to allow the Debtor to continue operating and fund the case. As stated in the APA, such advances will be a dollar-for-dollar credit on the base purchase price of $2.3 million if the Stalking Horse is the ultimate purchaser of the Assets pursuant to the APA.

9. **Proceeds of Sale and Disposition of Proceeds**. An estimate of the gross proceeds anticipated from the sale, together with an estimate of the net proceeds coming to the estate, with an explanation of the items making up the difference is as follows: The gross sale proceeds, less the ordinary and customary seller's closing costs, tax prorations and $20,000.00 for final administrative claims, will be disbursed to Hometown Bank, the primary secured creditor, in an amount necessary to pay Hometown Bank in full. If the proceeds are in excess of the amount owed to Hometown Bank, then the excess proceeds will be deposited into the trust account for Murphy Desmond S.C., to be disbursed pursuant to further order of this Court. We cannot estimate the amount of Gross Proceeds of sale because there are adjustments to the purchase price that are not yet liquidated but are addressed in section 3.1.2 of the APA attached to the Motion.

- 4 -

10. **Debt Structure of Debtor**. The Debtor filed its Bankruptcy Schedules and Statement of Financial Affairs on the Petition Date and these documents summarize the Debtor's assets and liabilities.

11. **Effect on Employees**. To the best of my information and belief, the Stalking Horse intends to maintain operations in Mayville, Wisconsin, and offer employment to some, if not all, of Debtor's current employees.

12. **Break-up Fee**. The APA provides for a Break-Up Fee of $100,000 to be paid to the Stalking Horse if the Stalking Horse is not the ultimate buyer at the Auction. Debtor determined that the Break-Up Fee is reasonable because the APA is the best offer the Debtor has received, to date, and the APA requires the Break-Up Fee. In addition, the Break-Up Fee is only 4% of the base purchase price. The Stalking Horse has spent and will continue to spend funds in due diligence, in preparation of the APA and in participating in this case. In this case more than in other similar cases, the Stalking Horse has agreed to make the advances necessary (in its discretion) to fund the administrative costs of the Chapter 11 case because Hometown Bank has refused to do so. Therefore, the Stalking Horse has even greater risk than is more typical in a transaction of this nature.


_Jane F. (Ginger) Zimmerman_

Subscribed and sworn to before me this
_25_ day of _August_ , 2011.


Notary Public, State of Wisconsin
My Commission: _\[Permanent\]_

4843-2933-6074, v. 1

**UNITED STATES BANKRUPTCY COURT    EASTERN DISTRICT OF WISCONSIN**

In the Matter of:

**MAYVILLE DIE & TOOL, INC.,**                    Case No. *11-33128*

Debtor.

## DECLARATION OF GLEN HELMBRECHT

Glen Helmbrecht submits this Declaration of Glen Helmbrecht pursuant to 6004(b) of the Local Rules of the United States Bankruptcy Court for the Eastern District of Wisconsin, as follows:

1.    I am an adult resident of the state of Wisconsin and the President of Mayville Die & Tool, Inc. ("Mayville"). I make this Declaration based upon personal knowledge.

2.    On the date of this Declaration (the "Petition Date"), the Debtor filed its Petition for protection pursuant to Chapter 11 of Title 11 of the United States Code.

3.    Mayville is continuing in possession of its property and is operating and managing its business pursuant to 11 U.S.C. §§ 1107 and 1108.

4.    To date, a creditors' committee has not been established and a trustee has not been appointed.

Jane F. (Ginger) Zimmerman
State Bar No. 1012103
jzimmerman@murphydesmond.com
Rebecca R. DeMarb
State Bar No 1026221
rdemarb@murphydesmond.com
Murphy Desmond S.C.
33 East Main Street, 5th Floor
P.O. Box 2038
Madison, WI 53701-2038
Phone:   (608) 257-7181
Fax:  (608) 257-4333

**EXHIBIT E**

26010.118056-2rrd-190811cjm
Declaration of Helmbrecht

5.     Mayville is a Wisconsin Corporation owned by an Employee Stock Ownership Plan ("ESOP").   In existence since 1935, Mayville is a machining company that specializes in large forging dies for use by customers in aerospace, windmills, railroad, airline, large yacht racing boats and large equipment manufacturers.   Mayville employs 22 people full time at its location in Mayville, Wisconsin.

6.     On the Petition Date, Mayville was indebted to Hometown Bank of Fond du Lac, Wisconsin (the "Bank") in the approximate amount of $2,576,859.01.

> A. The lending relationship between the Bank and Mayville dates back to 2002.  In 2003, the Debtor and the Bank entered into a Term Loan in Part A and Part B in the original principal amount of $2 Million and $500,000, respectively, at the non-default interest rate of 7.25% per year and regular monthly payments of approximately $21,800 per month.  On the Petition Date, Mayville was indebted to the Bank, on the Term Loan, in the amount of approximately $1,324,917.43.
>
> B. In addition to the Term Loan, Mayville is indebted to the Bank pursuant to a Note entered into in October of 2009, in the original amount of up to $1,462,500.00, plus interest at the rate of prime plus 2.5% (currently 5.75%) per annum (the "2009 Note").  On the Petition Date, Mayville was indebted to the Bank, on the 2009 Note in the amount of approximately $1,251,941.58.

7.     The Bank claims a security interest in substantially all of Mayville's assets.

A. The Bank recorded the following mortgages against the real estate Mayville owns located at 700 Furnace Street, Mayville, Wisconsin (the "Real Estate") with the Dodge County Register of Deeds: July 5, 2002, as Document Number 960801; May 1, 2003, as Document Number 988263; and November 19, 2009 as Document Number 1137367.

B. The Bank perfected its interest in personal property collateral, including cash collateral, granted pursuant to Security Agreements dated May 1, 2003 and November 12, 2009, and General Business Security Agreements dated June 28, 2002 and October 31, 2003, by filing UCC-1 Financing Statements with the Wisconsin Department of Financial Institutions on July 1, 2002, May 6, 2003, November 4, 2003, and January 16, 2009.

C. In addition, the Bank's collateral includes purchase money security interests in various specific equipment by virtue of a Chattel Security Agreement dated May 1, 2003, and Financing Statement filed on May 20, 2003, and a Commercial Security Agreement dated November 12, 2009, and Financing Statement filed on November 17, 2009.

D. Bank has further perfected its interest in fixtures by virtue of a Financing Statement filed with the Dodge County Register of Deeds on May 1, 2003 and continued on January 22, 2008.

8.      In addition to Hometown Bank, Citibank, NA, claims a security interest in any accounts receivable from Alcoa Inc., pursuant to an agreement and a UCC-1 Financing Statement filed on January 3, 2005, continued September 22, 2009.

9.      In 2007, the ESOP, which is and acts as the shareholders of the corporation, voted to remove the president and the board of directors of Mayville, and then hired a new board of directors and a new temporary CEO. Soon after, Mayville spent over $1.5 million on equipment without setting up proper lines of credit, and paid down approximately $200,000 on its term debt, again without penning up any ability to borrow on a line of credit.

10.     Due to the decisions made in 2007, coupled with a downturn in business and the general economy, Mayville has experienced serious cash flow issues. The Bank has refused to advance any further funds. Although Mayville searched for a new lender, it was not able to find one willing to finance the operations of the business.

11.     Mayville began looking for a buyer of the business after it became clear that it would not be able to avoid default with the Bank or borrow additional operating capital. Since late 2010, Mayville has been in contact with seven companies to find a potential buyer. To date, the highest and best offer to purchase has been made by Mayville Asset Acquisition, LLC (the "Stalking Horse") in the Asset Purchase Agreement dated August 24, 2011 (the "APA").

12.     Mayville's ability to operate and pay its employees became contingent upon its entering into the APA. The base purchase price of the APA, subject to adjustments, is $2.3 million. The APA required Mayville's chapter 11 filing so that the Stalking Horse may receive the benefits of 11 U.S.C. § 363.

13.     Starting in October of 2010, I began taking steps to seek additional financing or refinancing of the obligation Mayville owed to its primary secured creditor, Hometown Bank. I sought such new or replacement financing from six different lenders. Given the condition of the business, I was unable to secure such financing.

14.     Beginning in November of 2010, I started working to find buyers for Mayville. Since that time, I have worked with seven different potential buyers, including Mayville Asset Acquisition, LLC (the "Stalking Horse"). I searched for parties who may be interested in purchasing the assets of Mayville including companies in the same industry as Mayville, customers of Mayville, companies suggested by our accounting firm's mergers and acquisitions group and companies suggested by Hometown Bank. We received two Letters of Intent from parties other than the Stalking Horse. With one Letter of Intent, the amount offered was lower than Hometown Bank was willing to accept. With regard to the other Letter of Intent, the amount offered was high enough but the Letter of Intent expired without an asset purchase agreement. The Asset Purchase Agreement with the Stalking Horse is the first Asset Purchase Agreement to be signed with a potential buyer.

15.     As stated, Mayville is owned by an Employee Stock Ownership Plan ("ESOP"). The most recent ESOP valuation was dated on June 24, 2011, and reflected a valuation as of September 30, 2010. The ESOP valuation concluded that the stock owned in Mayville was worth $0. The machinery and equipment owned by Mayville was appraised on January 25, 2011, by Hometown Bank and stated an auction value of the machinery and equipment of $1,328,500.00. Mayville's real estate was appraised on October 9, 2009, at a value of $951,000.00.

16.     The buyer in the APA is Mayville Asset Acquisition, LLC (the "Stalking Horse"), which is a wholly owned subsidiary of A. Finkl & Sons, Co. ("Finkl"). Finkl is both a supplier and a customer of Mayville. On the Filing Date, Finkl owed Mayville approximately $51,500.00 in accounts receivables. Mayville did not owe Finkl any money. As part of the APA, the Stalking Horse has agreed to consider lending funds to Mayville, post-petition. To the best of my knowledge, there are not further connections between Finkl and Mayville. In addition, there are connections between Finkl's customers and Mayville's suppliers. For example, some of Mayville's unsecured creditors are customers of Finkl. Otherwise, to the best of my knowledge, there are not connections between Finkl and Mayville's creditors, other parties in interest, their respective attorneys, accountants, the United States Trustee's Office or anyone employed by the United States Trustee's Office.

17.     I understand that the Stalking Horse intends to continue operating the business of Mayville and intends to offer employment to many, if not all, of Mayville's employees. To the best of my knowledge, the Stalking Horse will not have a relationship with Mayville's non-employee officers, directors and shareholders after closing.

18.     To the best of my knowledge, there are no material connections between Mayville's officers, directors, employees or other insiders and Hometown Bank (for example, guaranty).

19.     Three employees of Mayville are officers of Mayville and they are paid the following salaries: Glen Helmbrecht ($67,500 per year), Gregory Krapfl ($66,959 per year) and Gary Metke ($58,500 per year). All other Mayville employees are paid on an hourly basis. Non-employee directors are paid $200.00 per board meeting. To the best of my

knowledge, no further compensation is paid to Mayville's non-employee directors or other insiders.

Glen Helmbrecht
Glen Helmbrecht

Subscribed and sworn to before me this
23 day of _August_ , 2011.

Kathi McAllister
Notary Public, State of Wisconsin
My Commission Expires: 2-15-15
4834-7856-2570, v. 1
State Wisconsin
County Dodge

26010.118056-2rrd-190811cjm
Declaration of Helmbrecht

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MAYVILLE DIE & TOOL, INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

### DECLARATION OF STEVEN D. DENTEN IN SUPPORT OF GOOD FAITH FINDING UNDER 11 U.S.C. § 363(m) IN FAVOR OF PROPOSED STALKING HORSE PURCHASER

I, Steven D. Denten, state and declare as follows:

1.      I am the Controller and Director of Human Resources of A. Finkl & Sons Co. ("Finkl"). I am also the Controller of Mayville Asset Acquisition, LLC ("Stalking Horse"), a wholly owned subsidiary of Finkl. I am duly authorized to make this Declaration on behalf of Finkl and the Stalking Horse. I make this Declaration, in my capacity as Controller of both Finkl and Stalking Horse, based on my own personal knowledge and based on my knowledge and review of the business records of Finkl and the Stalking Horse. If called as a witness, I could truthfully and competently testify to the matters stated in this Declaration.

2.      Pursuant to Local Bankruptcy Rule 6004(f),[1] I submit this Declaration in connection with the Stalking Horse's offer to purchase substantially all of the assets and business of Mayville Die & Tool, Inc., the debtor and debtor-in-possession ("Debtor") in the above-captioned voluntary chapter 11 case ("Bankruptcy Case").

---

[1] LBR 6004(f) of the Bankruptcy Court for the Eastern District of Wisconsin requires "an evidentiary basis for a finding of good faith under § 363(m). Evidence can be presented in the form of a declaration from the prospective purchaser."

*EXHIBIT F*

**Identity of Stalking Horse**

3.      The Stalking Horse, a Delaware limited liability company, has been formed for the specific purpose of purchasing substantially all of the Debtor's assets in the Bankruptcy Case pursuant to the terms of the APA (defined below).

4.      Finkl and its affiliates melt, forge, heat treat and machine die, mold and custom steels. Finkl has been in business for over 130 years and is located on the north side of Chicago, at 2011 N. Southport Avenue, Chicago, Illinois 60614. Finkl has over 350 employees throughout the United States. At its main facility in Chicago, Illinois, the main workforce is represented by three different unions. Finkl is currently in the process of expanding its operating capacities in Chicago.

**Relationship to Debtor-Seller**

5.      The Debtor is a large machine shop and die sinker located in Mayville, Wisconsin. The Debtor has been one of Finkl's vendors for over twenty years. The Debtor continues to work with Finkl in the processing of steel.

**Background of Stalking Horse Negotiations**

6.      In April 2011, the Debtor informed Finkl that (i) the Debtor was having liquidity problems and (ii) its existing lender, Hometown Bank, was re-evaluating its lending relationship with the Debtor. Shortly thereafter, the Debtor advised Finkl that it was unsuccessful both in its attempts to renew its existing line of credit with Hometown Bank and in its attempts to secure an alternative lender to fund its projected future working capital needs.

7.      Under these circumstances, the Debtor approached Finkl and broached the subject of Finkl purchasing the Debtor's business as a going concern. Previously, the

Debtor had not less than four potential suitors for its business; however, none of the suitors made an acceptable offer to buy the Debtor's business as a going concern.

8.    In May and June 2011, Finkl began reviewing financial information provided by the Debtor and, with the Debtor's permission, interviewed representatives of the Debtor's union and its existing secured lender, Hometown Bank, to determine whether the Debtor could be a potential strategic acquisition target.

9.    In July and August 2011, Finkl conducted limited due diligence respecting the Debtor's assets and business operations, and engaged in further discussions with the Debtor and Hometown Bank respecting the potential terms of a going concern purchase of the Debtor's business. Finkl also engaged in further dialogue with the Debtor's union respecting labor and collective bargaining issues.

10.    In August 2011, the Debtor and the Stalking Horse negotiated the material terms and conditions of a going concern sale transaction. Such good faith, arm's length negotiations ultimately culminated in an agreement in principal on the pricing and structure of the transaction, subject to definitive documentation.

11.    On August 24, 2011, after multiple rounds of further negotiations respecting material deal terms, and after several iterations of a draft agreement, the Debtor and the Stalking Horse executed an asset purchase agreement ("APA").

12.    Pursuant to the terms of the APA, the Debtor would sell and the Purchaser would buy substantially all of the Debtor's assets and its business operations for the base purchase price of $2,300,000 less certain purchase price adjustments as set forth in Section 3.1.2(a) of the APA.

13.     Because of the Debtor's liquidity problems, Finkl, directly or through one of its affiliates, is willing to provide certain credit support to the Debtor through the closing of the contemplated sale transaction pursuant to and in accordance with the terms of the APA.

**Stalking Horse's Experience in the Debtor's Industry**

14.     The Stalking Horse is a strategic buyer. The APA contemplates a going concern purchase of the Debtor's assets and business operations, which will have the intended effect of preserving local jobs. The Stalking Horse anticipates expanding its machining capacity immediately, using the Debtor's existing employees and large machine tools. Acquiring the Debtor's business will enable Stalking Horse to enter into new machining markets, including die sinking, precision machining and boating.

**Evidence of Financial Ability to Close**

15.     Finkl, the Stalking Horse's parent, has a strong balance sheet and has been profitable over the years. Finkl has more than adequate resources under its existing line of credit with Bank of America, N.A. for the Stalking Horse to close the transactions contemplated by the APA and to operate the business post-closing.

**Stalking Horse Would Be a Good Faith Purchaser**

16.     To the best of my knowledge, neither the Debtor, the Stalking Horse, Finkl, or their respective representatives and agents have engaged in any conduct that would cause or permit the APA or consummation of the transactions contemplated thereunder, to be avoided under section 363(n) of the Bankruptcy Code, nor have they acted in any improper or collusive manner with any person.

17.     The APA was proposed, negotiated and entered into by the Debtor and the Stalking Horse without collusion, in good faith and from arm's length bargaining positions.  Under the APA, the parties will achieve a fair and reasonable price without fraud, collusion or bad faith.

18.     Neither the Stalking Horse nor Finkl is an affiliate of the Debtor.  No current or former officer, director, managing agent, or employee of the Debtor is a principal of or otherwise associated with the Stalking Horse or Finkl or with any affiliate of Finkl.

19.     The Stalking Horse and Finkl have, at all times, dealt at arm's length and in good faith with the Debtor and its agents, have no connection with any insider of the Debtor, and have not received any material non-public information regarding the Debtor's assets or business from the Debtor or its agents except through the informal due diligence process established by the Debtor prepetition to secure the Stalking Horse's bid.

20.     The Stalking Horse's proposed offer to purchase all of the Debtor's assets and business pursuant to the terms of the APA was made solely on behalf of the Stalking Horse and for the Stalking Horse's sole benefit.  Neither the Stalking Horse nor Finkl is a party to any agreement among potential bidders for the Debtor's assets or business and neither of them has, intends or will enter into any such agreement or otherwise conspire to chill bidding for such assets or business.

*[signature page follows]*

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on August 24, 2011, at Chicago, Illinois.

STEVEN D. DENTEN

*Controller and Director of Human Resources*
A. Finkl & Sons Co.

*Controller*
Mayville Asset Acquisition, LLC